# UNITED STATES v. CORS.

No. 132. Argued February 4, 1949.—Decided·June 13, 1949.

*Oscar H. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Paul A. Sweeney* and *Paul D. Page, Jr.*

*John Lord O'Brian* argued the cause for respondent. With him on the brief were *Frank C. Mason, Harold A. Kertz, John G. Laylin, Charles A. Horsky* and *Donald Hiss.*

*Charles B. McInnis* filed a brief for the R. T. C. No. 11 Corporation et al., as *amici curiae,* in support of respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit in the Court of Claims under § 902 of the Merchant Marine Act of 1936, 49 Stat. 2015, as amended, 53 Stat. 1255, 46 U. S. C. § 1242, to recover the balance of "just compensation" alleged to be due respondent from the United States for requisitioning his steam tug, the *MacArthur,* in October, 1942. The tug was a Coast Guard boat built in 1895 and used by it in harbor duties at Baltimore until 1939. It was then transferred to the Coast Guard base at Portland, Maine.

In September, 1941, the Coast Guard advertised it for sale to the highest bidder. Respondent was the highest bidder, purchasing the tug in Maine on March 19, 1942, for $2,875. Thereafter he expended $5,699.78 on labor and materials in repairing and improving the vessel, an amount which would have been substantially greater had he not performed part of the work himself. In April, 1942, respondent received from the Department of Commerce a certificate designating the vessel as a towing steam vessel and authorizing him to employ it in the coastal trade for one year. Respondent then brought the tug to Staten Island, New York, where it remained until requisitioned by the War Shipping Administration on October 15, 1942. A survey by the Navy had indicated it was suitable as a steam-heating plant for heating and pumping fuel oil from oil barges into naval combat vessels. Its condition was said to be "fair to good"; and its original cost was estimated to be $45,000; its replacement cost, $56,000; and its present value $9,000. It was used as a steam plant to heat oil for use in combat ships.

The War Shipping Administration determined that $9,000 was "just compensation" for the tug and offered that amount to respondent. Respondent accepted 75 per cent of the award, as he was permitted to do by § 902 (d) of the Act, and brought suit to recover the balance of the $20,000 which he alleged was the "just compensation" to which he was entitled, plus interest.

Section 902 (a) of the Act,[1] after providing that the owner of any vessel requisitioned by the Commission shall

---

[1] Section 902 (a) provides:

"Whenever the President shall proclaim that the security of the national defense makes it advisable or during any national emergency declared by proclamation of the President, it shall be lawful for the Commission to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency,

be paid "just compensation for the property.taken or for the use of such property," goes on to state "but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use." It is around this latter clause that the present controversy turns.

. The Court of Claims found that the fair market value at the time of the taking was $15,500 and that respondent was entitled to receive that amount, less the sum already paid, plus interest. 110 Ct. Cl. 66, 75 F. Supp. 235. The importance of that decision in the settlement of claims arising as a result of the requisitioning program during the period of recent hostilities led us to grant the petition for certiorari.

The United States admitted liability for only $10,500, claiming that $5,000 of the market value was due to an enhancement brought about by its need for vessels which necessitated their taking. The Court of Claims found that at the time of the requisitioning there existed in and about the Port of New York "a rising market and a strong demand for tugs of all types" due in part at least to the government's requisitioning program. It found that the

---

to requisition or charter the use of any such property. The termination of any emergency so declared shall be announced by a further proclamation by the President. When any such property or the use thereof is 'so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, *but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use.* If any property is taken and used under authority of this section, but the ownership thereof is not required by the United States, such property shall be restored to the owner in a condition at least as good as when taken, less ordinary wear and tear, or the owner shall be paid an amount for reconditioning sufficient to place the property in such condition. *The owner shall not be paid for any consequential damages arising from a taking or use of property under authority of this section.*" (Italics added.)

market value of the tug had been enhanced $5,000 by October 15, 1942, due (1) to the great increase in shipping and harbor traffic because of the war and (2) to the government's need for vessels in the prosecution of the war.[2] But the Court of Claims held that an owner of property taken by the government was entitled to no

---

[2] The findings on these issues were as follows:

"At the time of the requisition, there existed in and about the Port of New York a rising market and a strong demand for tugs of all types, including the *MacArthur*. This situation was due to the greatly increased traffic in the harbor during the period of the war, to the fact that the Government had been requisitioning tugs and to the resulting shortage of tugs. Tugs were operated day and night in an effort to handle the increased business and, under those conditions most tug owners were reluctant to sell. However, from August 1941 to February 1943, six tugboats were sold on the open market in or near the Port of New York. None of these sales involved a vessel closely comparable to the *MacArthur* in design, power, and equipment. . . ."

"Beginning on September 8, 1939, the date on which the President proclaimed the existence of a limited national emergency, and continuing up to the date that plaintiff's vessel was requisitioned, there was a general rise in the market values of nearly all vessels in and about the Port of New York. This increase in values between September 8, 1939 and May 27, 1941, the date on which the President proclaimed the existence of a general national emergency, was due to the demand for vessels which followed the outbreak of war in Europe. After May 27, 1941 and particularly after December 7, 1941, the date of the Japanese attack on Pearl Harbor, the rise in market values was due to the Government's need for vessels, which necessitated the taking of many vessels, and to the great increase in shipping and in harbor traffic which occurred during the period of the war. These conditions combined to create a demand for and a shortage of tugs. As a result, the market value of the *MacArthur* had been enhanced by the sum of $5,000.00 by October 15, 1942.

"Prior to the time the defendant requisitioned the *MacArthur* there was no reasonable prospect that she would be requisitioned, and no part of the enhancement in her value was due to such a prospect."

less than he could have received on the market from others, which in the present case was $15,500.

The Comptroller General has ruled that § 902 (a) prohibits the payment of compensation to the extent that it may be based on values in excess of those existing on the date of the President's proclamation of a limited national emergency (September 8, 1939),[3] provided that such excess be determined as due to economic conditions directly caused by the national emergency.[4]

The Advisory Board on Just Compensation[5] formulated various rules for the guidance of the War Shipping Administration in its requisitioning program, including the following:

> "From the value at the time of taking, there should be deducted any enhancement due, to the Government's need of vessels which has necessitated the taking, to the previous taking of vessels of similar type, or to a prospective taking, reasonably probable, whether such need, taking, or prospect, occurred be-

---

[3] See 3 C. F. R. Cum. Supp. 114.

[4] 22 Comp. Gen. 497, 608.

[5] See Exec. Order 9387, Oct. 15, 1943, 8 Fed. Reg. 14105, 3 C. F. R., 1943 Supp. 48–49. The Executive Order provided in part:

"The Board, in accordance with the applicable provisions of the Constitution and the laws of the United States, shall establish fair and equitable standards, rules and formulae of general applicability for the guidance of the War Shipping Administration in determining the just compensation to be paid for all vessels requisitioned, purchased, chartered or insured by the Administration. The Board may prescribe such rules, regulations and procedures as it deems necessary or advisable in carrying out its functions.

"In determining the amount of just compensation which should be paid for each vessel, the War Shipping Administration will be guided by the general standards, rules and formulae established by the Board."

- This Board was composed of Learned Hand, John J. Parker, and Joseph C. Hutcheson, Jr.

fore or after the declaration of the national emergency of May 27, 1941. Enhancement due to a general rise in prices or earnings, whenever occurring, should not be deducted. In the application of this rule neither the proclamation of limited emergency of September 8, 1939, nor the facts existing at that time, are in themselves of significance. The Board does not determine whether any enhancement after May 27, 1941, other than as enumerated above as deductible, should be excluded; since the Board is advised that the value of oceangoing vessels was higher on May 27, 1941, than at the time of taking, and that any enhancement since May 27, 1941, in vessels of other types, not deductible under the foregoing, is attributable to a general rise in prices or earnings, and should therefore not be deducted."

The Department of Justice agrees with both the Comptroller General and the Advisory Board that the enhancement which is excluded is not limited to that accruing in the period after the declaration of a national emergency on May 27, 1941 [6] and contends for a construction which would eliminate any enhancement on values due to the war. It argues that the Act as so construed, though different from hitherto announced judicial rules of construction of "just compensation" within the meaning of the Fifth Amendment, is nevertheless constitutional.

Respondent, relying largely on *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, argues that if that construction is adopted it makes the enhancement clause unconstitutional because it conflicts with the judicial construction of "just compensation" and is therefore beyond the competence of Congress to prescribe.

*First.* We need not reach the question whether the measure of compensation which Congress wrote into the

[6] 3 C. F. R. Cum. Supp. 234.

Act is in all of its applications identical with the judicial standard. We are satisfied that on the present facts the two are coterminous.

The Court in its construction of the constitutional provision has been careful not to reduce the concept of "just compensation" to a formula. The political ethics reflected in the Fifth Amendment reject confiscation as a measure of justice. But the Amendment does not contain any definite standards of fairness by which the measure of "just compensation" is to be determined. *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266, 279–280; *United States* v. *Petty Motor Co.,* 327 U. S. 372, 377. The Court in an endeavor to find working rules that will do substantial justice has adopted practical standards, including that of market value. *United States* v. *Miller,* 317 U. S. 369, 374. But it has refused to make a fetish even of market value, since that may not be the best measure of value in some cases. At times some elements included in the criterion of market value have in fairness been excluded, as for example where the property has a special value to the owner because of its adaptability to his needs or where it has a special value to the taker because of its peculiar fitness for the taker's project. See *United States* v. *Miller, supra,* 375 and cases cited. Moreover, where the government lays out a project involving the taking of lands, no increment of value arising by virtue of the fact that a particular tract is clearly or probably within the project may be added. *Id.,* 376–379 and cases cited. Any increase in value due to that fact would reflect speculation as to what the government could be compelled to pay and hence in fairness should be excluded from the determination of what compensation would be just. *Id.,* 377.

The Court of Claims recognized these rules. But it concluded that they represented the only exceptions to the requirement that market value be paid, that they were

inapplicable here, and that therefore there was no enhancement in the value of the vessel that should be excluded from the fair market value in making the award to respondent. We believe, however, that these exceptions are merely illustrations of a principle which excludes enhancement of value resulting from the government's special or extraordinary demand for the property.

The special value to the condemner as distinguished from others who may or may not possess the power to condemn has long been excluded as an element from market value. See *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 76. In time of war or other national emergency the demand of the government for an article or commodity often causes the market to be an unfair indication of value. The special needs of the government create a demand that outruns the supply. The market, sensitive to the bullish pressure, responds with a spiraling of prices. The normal market price for the commodity becomes inflated. And so the market value of the commodity is enhanced by the special need which the government has for it.

That seems to have been the situation in the present case. For, as we have seen, the Court of Claims found that at the time of the requisition there was "a rising market and a strong demand for tugs of all types" in and around the Port of New York, due in part at least to the shortage of tugs resulting from the government's requisitioning program.

It is not fair that the government be required to pay the enhanced price which its demand alone has created. That enhancement reflects elements of the value that was created by the urgency of its need for the article. It does not reflect what "a willing buyer would pay in cash to a willing seller," *United States* v. *Miller, supra,* 374, in a fair market. It represents what can be exacted from the government whose demands in the emergency have cre-

ated a sellers' market. In this situation, as in the case of land included in a proposed project of the government, the enhanced value reflects speculation as to what the government can be compelled to pay. That is a hold-up value, not a fair market value. That is a value which the government itself created and hence in fairness should not be required to pay.

*Second.* What we have said is in accord with our reading of the Report of the Advisory Board. Any enhancement of value must be deducted where it is due (a) "to the Government's need of vessels which has necessitated the taking," (b) "to the previous taking of vessels of similar type," or (c) "to a prospective taking, reasonably probable. . . ."

The government's need of vessels which has necessitated the taking is its need for the precise ship taken, for the type or class of ship taken, or for ships which perform the same or related functions. The government's need for cargo vessels may affect indirectly the price level of many commodities. It may, for example, affect the price of rowboats. But if the government takes a rowboat, the enhancement to be excluded is that which results from the government's activities in the particular market. It is the government's demand in that market that is the measure of the "causes necessitating the taking or use" in this situation.[7]

We also agree with the Advisory Board that the enhancement which is excluded is that which arises before as well as after the declaration of the national emergency of May 27, 1941. Section 902 (a) does not have any limiting factor so far as time is concerned. But we cannot say from this record whether any part of the $15,500 that the Court of Claims found to be the fair

---

[7] Whether there might be a different measure of those causes in other situations is a question we do not reach.

market value of the tug at the time of the taking includes any deductible enhancement in value. The Court of Claims found, to be sure, that there was no reasonable prospect of the condemnation of the tug and hence no enhancement in value due to that reason. Yet, as we have seen, that is only one source of the enhancement in value which is deductible. There are no findings as to the effect on the market either of the previous taking, if any, of vessels of a similar type, or of the government's need of vessels necessitating the taking, as we have construed it. The only findings at all relevant to these factors are (1) that the increase in market values of "nearly all vessels in and about the Port of New York" between September 8, 1939 and May 27, 1941 was due to "the demand for vessels which followed the outbreak of war in Europe"; and (2) that such increase after May 27, 1941, and particularly after December 7, 1941, was due to "the Government's need for vessels, which necessitated the taking of many vessels, and to the great increase in shipping and in harbor traffic" during the war.[8] These findings, however, are not sufficiently discriminating. They do not show the effect on the market of the government's need for this particular ship, for this type or class of vessel, or for ships which perform the same or related functions. The findings as to the rising market for tugs in and about the Port of New York tell us that some of that enhancement is due to the government's need. But we are left in the dark as to how much it may be.

In sum the findings do not tell us with sufficient particularity what was the effect of the government's activities in the particular market. Nor do we know whether increases in value of the vessel up to March 19, 1942, when the United States sold it to respondent, were re-

---

[8] See note 2. *supra.*

flected in the sale price. If they were, the United States has received any enhancement in value that resulted from its need up to that date.

Finally, respondent argues that the actual basis for the increase in value of the vessel between March and October, 1942 (the period when respondent owned it) is due to causes other than the government's need. He points out that his total monetary expenditure on the vessel amounted to $8,574.78, of which $5,699.78 represented labor and materials. The latter amount, however, would have been substantially greater had not respondent himself performed part of the labor. Respondent plainly would be entitled to any increase in value due to that factor. Moreover, when respondent repaired and reconditioned the boat it was certificated as a towing steam vessel, a substantially new use for the tug. These two factors alone, plus the general price increase, are said to account for the $5,000 enhancement in value found by the Court of Claims.

We start with findings that tell us that some of the enhancement in market value is due to the government's need. It is sheer speculation to say that there are offsets against that enhancement which so reduce it as to render the construction of the Act an abstract question. Cf. *Ashwander* v. *Valley Authority*, 297 U. S. 288, 324. The inadequacies in the findings are due to the erroneous construction of the Act by the Court of Claims.

*Reversed.*

Mr. Chief Justice Vinson dissents.

Mr. Justice Frankfurter, with whom Mr. Justice Jackson and Mr. Justice Burton join, dissenting.

We brought this case here on certiorari to the Court of Claims under 28 U. S. C. § 1255 (1) because it seemed to present constitutional issues important in the award

of compensation for vessels requisitioned by the Govern-ment during the recent national emergency under § 902 (a) of the Merchant Marine Act of 1936.[1]

The following facts are the basis of the claim that the scope and validity of that section of the Merchant Marine Act call for adjudication.

The steam tug *Guthrie* was owned by the United States and operated by the Coast Guard continuously from 1895, when she was built, until 1941. In that year a special Board of Survey appointed to determine her condition found her in need of a new boiler and extensive repairs. In view of "the present emergency and the great need of vessels," the Board recommended that the necessary reconditioning be undertaken. The Coast Guard, however, directed that she be sold to the highest bidder. Respondent's was the highest bid received, and on March 19, 1942, the *Guthrie* was sold to him for $2,875. He

---

[1] "Whenever the President shall proclaim that the security of the national defense makes it advisable or during any national emergency declared by proclamation of the President, it shall be lawful for the Commission to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency, to requisition or charter the use of any such property. The termination of any emergency so declared shall be announced by a further proclamation by the President. When any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use. If any property is taken and used under authority of this section, but the ownership thereof is not required by the United States, such property shall be restored to the owner in a, condition at least as good as when taken, less ordinary wear and tear, or the owner shall be paid an amount for reconditioning sufficient to place the property in such condition. The owner shall not be paid for any consequential damages arising from a taking or use of property under authority of this section." 49 Stat. 2011, 2015, as amended, 46 U. S. C. § 1242.

proceeded to carry out the repairs that had been indicated by the Coast Guard survey, doing most of the work himself with the aid of a crew of four; the rest was done by a shipyard at Portland. His total expenditure on labor and materials was $5,699.78 but would have been substantially greater had he not been experienced in this type of work.

On April 20 and 21, the Department of Commerce licensed the *Guthrie* as a "towing steam vessel" permitted to navigate in "bays, sounds, rivers and harbors" and also authorized respondent to employ her in the coasting trade. Respondent then brought her under her own power to New York where she was rechristened the *MacArthur* and where she remained inactive until September, 1942, when the Navy surveyed her for use as a steam-heating plant for heating and pumping fuel oil from barges into combat vessels. On October 15, 1942, the War Shipping Administration requisitioned the *MacArthur* for the Navy and later offered respondent $9,000 as compensation for her. This figure was based upon the Coast Guard survey, the Navy survey, and the rules adopted by the Advisory Board on Just Compensation which had been appointed to clarify the measure of compensation payable by the War Shipping Administration under § 902 (a) of the Merchant Marine Act.[2] Respondent protested against

---

[2] The Advisory Board on Just Compensation, consisting of Judge Learned Hand, Judge John J. Parker, and Judge Joseph C. Hutcheson, Jr., was appointed under Exec. Order 9387, Oct. 15, 1943, 8 Fed. Reg. 14105, 3 C. F. R. 1943 Supp. 48–49. The following is the most important of the rules adopted by the Board:

"Rule 4. From the value at the time of taking, there should be deducted any enhancement due, to the Government's need of vessels which has necessitated the taking, to the previous taking of vessels of similar type, or to a prospective taking, reasonably probable, whether such need, taking, or prospect, occurred before or after the declaration of the national emergency of May 27, 1941. Enhance-

the award and, as he was entitled to do under § 902 (d) of the Act, accepted 75% of it, and brought suit in the Court of Claims for the difference between the amount he had been offered and the amount he alleged·to be due as just compensation.

The Court of Claims found that the market value of the *MacArthur* on the date of taking was $15,500. 110 Ct. Cl. 66. The Government does not dispute that there was a market nor that value on the market was as found, but insists that there should have been deducted from it an amount representing enhancement "by the causes necessitating the taking" under the terms of § 902 (a). It bases this contention on two findings of the Court of Claims. The first is that "At the time of the requisition, there existed in and about the Port of New York a rising market and a strong demand for tugs of all types, including the *MacArthur*. This situation was due to the greatly increased traffic in the harbor during the period of the war, to the fact that the Government had been requisitioning tugs and to the resulting shortage of tugs." 110 Ct. Cl. at 75–76. The second is that the market value of the *MacArthur* had been enhanced between September 8, 1939, when the President proclaimed a

---

ment due to a general rise in prices or earnings, whenever occurring, should not be deducted. In the application of this rule neither the proclamation of limited emergency of September 8, 1939, nor the facts existing at that time, are in themselves of significance. The Board does not determine whether any enhancement after May 27, 1941, other than as enumerated above as deductible, should be excluded; since the Board is advised that the value of oceangoing vessels was higher on May 27, 1941, than at the time of taking, and that any enhancement since May 27, 1941, in vessels of other types, not deductible under the foregoing, is attributable to a general rise in prices or earnings, and should therefore not be deducted." House Committee on the Merchant Marine and Fisheries Doc. No. 47, 78th Cong., 1st Sess.

limited national emergency; and October 15, 1942, when she was requisitioned, by the sum of $5,000, part of which, after proclamation of a general national emergency on May 27, 1941, "was due to the Government's need for vessels, which necessitated the taking of many vessels . . . ." *Id.* at 77. But the Court of Claims concluded that "It is not possible to allocate to the [Government's need] a definite part of the increase in market value, but even if it were possible to do so, we do not think the defendant is entitled to a deduction from market value on this account." *Id.* at 78.

The Government's arguments in support of its claim that all or part of the $5,000 enhancement in market value of the *MacArthur* should be deducted in computing just compensation to respondent ultimately reduce to two. The first is that there should be deducted any speculative increase of value due to the probability of the taking. It is clear that such a deduction must be made where the increase is traceable to the probability that the Government would take the particular property for which compensation is sought. *United States* v. *Miller,* 317 U. S. 369. But the application of this principle is impossible here in the face of the Court of Claims' explicit finding that "prior to the time the defendant requisitioned the *MacArthur* there was no reasonable prospect that she would be requisitioned, and no part of the enhancement in her value was due to such a prospect." 110 Ct. Cl. at 77. It is arguable, however, that the rationale of the *Miller* case should be extended to property of a less unique character than land—property of a class any member of which would fulfill the taker's need more or less equally well. As to such property there may be speculative increase in value because of the dual expectation that some members of the class will be taken and that the taker may be forced to pay,

when the time comes for the award of compensation, something more than what would have been market value had not speculation occurred. See *McGovern* v. *New York*, 229 U. S. 363, 372. And this might be true even though it could not be said that it was probable that a particular member of the class—in this .case a particular tug—would be taken.[3]

But this is a question we do not need to pass on now because, in addition to the finding that it was not probable that the *MacArthur* would be taken, the record

---

[3] The core of the problem emerged in the following colloquy at the hearing held before the Advisory Board on Just Compensation:

"Judge Hand: It comes to this, that a society which foresees a shortage, a consequent shortage in one kind of supply, must either proceed at once to seize, or must subject itself and society at large to the disadvantage which comes from the shortage. But when the shortage comes, it may not say 'So far, and no farther. We leave the property in your hands for use, but we are helpless to prevent your further exploitation of society by your special interest.'

"Is that your position?

"Mr. McInnis: I think, your Honor, that that is the logical implication of my argument.

"Judge Hand: It does seem to me, if it is all perfectly clearly known in advance, to put a society in a rather helpless position as against a small group that has control of all of one vital commodity. You can imagine cases where that would work a result that no one would support. You can imagine the destruction of a large part of food in a community where there was no immediate relief, and, as I understand your argument, they either have to take it now, or when they would find it more convenient to take it they should have to submit to the increase in value, however clearly the owners were advised at a given point, 'This marks the end of that kind of profit—scarcity profit.'

"Mr. McInnis: I think that is correct, Judge. But I would agree—

"Judge Hand (interposing): It might be that the Constitution protects that kind of profit. I won't say now." 1 Report of Proceedings of the Advisory Board 134–135 (United States Maritime Commission, War Shipping Administration, mimeographed, 1943).

contains evidence of the most conclusive kind that a taking was improbable: the Government had got rid of the tug only seven months before the taking, with complete awareness that she was capable of being adequately reconditioned. Among those whose dealings in tugs established market value, therefore, whatever may have been the tendency of their activities to bring about speculative increase in the value of tugs generally, it must have seemed so unlikely that the Government would reverse itself and take the *MacArthur* back that the market value found by the Court of Claims for this particular tug could hardly have reflected enhancement due to speculation at the expense of the Government's need for her. It may be suggested, to be sure, that the need which prompted this reversal might have been anticipated by one shrewd enough to foresee a growing shortage of tugs more accurately than those responsible for the Government's decisions in these matters. But whatever might conceivably be the effect on the market of the operations of such persons, it would be an effect so far beyond the possibility of measurement that it would be futile in the extreme to remand for a finding on the point, especially when it is remembered that the *MacArthur* was requisitioned not for use as a tug. but as a heating plant.

We must reject, therefore, speculation by purchasers of tugs at the expense of the Government's need as a factor contributing to the market value of the *MacArthur* at the time she was requisitioned. The only other way that has been suggested in which her market value could have been increased by the Government's need is as a result of the increase in demand presumably brought about by previous Government seizures of tugs during a period when, as the Court of Claims found, there was a shortage of tugs due to a great "increase in shipping and

harbor traffic." In this indirect way, the Government's need can be regarded as a "cause" of the increase in the *MacArthur's* market value. Because this need could be foreseen at least by the time of the declaration of limited national emergency on September 8, 1939, the Government argues that all enhancement in the value of vessels since that date should therefore be deducted from their market price in determining just compensation. In the alternative, it urges that there should be deducted that proportion of this increase which is allocable to the Government's intervention in the market.

Whether regarded as founded upon § 902 (a) of the Merchant Marine Act or upon judicial principles of just compensation, both these contentions, in my judgment, must be rejected. When the Government first took out of commercial operation some of the tugs which had been thus employed, it could requisition them at a price uninfluenced by its own need. A subsequent increase in the market value, though precipitated by the shortage caused by the earlier taking, could be a direct result only of the tug operators' need for the remaining tugs, not of the Government's for those it had taken. Leaving enhancement attributable to speculation out of account, as the record obliges us to do, the Government could then requisition still more tugs at a market value at most no higher than the level at which the new price had settled. Unlike an increase due to speculation by buyers of tugs that awards for requisitioned tugs would exceed the price likely to be paid by commercial operators purchasing tugs for their own use, an increase due to shortage would affect the price to any purchaser and enhance value to any owner even though no further requisitions were anticipated and even though none were made. Exactly the same increase would result whether the shortage were induced by the expanded business of a commercial oper-

ator or by Government requisition. It simply is not true therefore, that the enhanced price resulting from shortage is a price which the need necessitating the taking, as opposed to need of the tug operators, created.

The need of the tug operators, moreover, not merely for the tugs that had been taken, but for additional tugs, was in its turn only one factor in the complex which makes up demand in a period of high costs, high wages, shortages, and inflation. We speak, in referring to the interacting forces of such a period, of the "inflationary spiral," and although a requisition by the Government in the midst of this dynamic process undoubtedly has some effect in accelerating it, it is an effect which loses its ascertainable significance by being merged with countless other factors. Whatever may be the proper scope of the declaration in § 902 (a) that the value of vessels taken during the national emergency shall not "be deemed enhanced by the causes necessitating the taking or use," the wartime economy itself cannot be regarded as such a cause. Even assuming that there may be other circumstances than those of gambling on the result of an award in which a connection between the taker's intervention in the market and an enhancement of price might be traced, on this record it would be asking for the impossible to insist on an attempt to trace one. The Government has advanced no basis for the undertaking; it points to no evidence already offered which would justify it and suggests none that it might have offered. Under the circumstances, we should not require the Court of Claims to embark upon so murky a sea of speculation. Cf. *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, 223–24.

If what I have said appeals to common sense, market values which have been increased as the result of the interaction of supply and demand in a wartime economy

cannot be rejected as the applicable measure of just compensation merely because the competition of the Government, regarded from the point of view of an exercise in tracing ultimate causes, may theoretically be deemed to have contributed to the increase. Nor is it to make a fetish of market value to affirm its selection as a standard in a case where no other standard that offers the possibility of observance has been put forward. The record rules out any increase due to speculation, the only other suggested form of enhancement attributable to the Government's need. Since it is our duty to avoid constitutional adjudication, see the concurring opinion of Mr. Justice Brandeis in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341, 346 *et seq.,* and *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568 *et seq.,* the decision below should be affirmed without reaching the constitutional issues raised by the Government's construction of § 902 (a).