**AMERICAN–HAWAIIAN S. S. CO. v. UNITED STATES.**

**THE ALASKAN.**

United States District Court
S. D. New York.
March 20, 1950.

Kirlin, Campbell, Hickox & Keating, New York City, proctors for libelant (Clement C. Rhinehart, New York City, of counsel).

Irving H. Saypol, United States Attorney, New York City, proctor for United States (H. G. Morison, Assistant Attorney General, Leavenworth Colby, Special Assistant to the Attorney General, Paul D. Page, Jr., Solicitor, Washington, D. C., Joseph A. Klausner, Attorney, U. S. Maritime Commission, New York City, of counsel).

LEIBELL, District Judge.

This is an action by the libelant to recover "just compensation" from the United States for the requisition and loss of its vessel, the S. S. Alaskan, brought under Section 902 of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1242. In an opinion filed January 21, 1949 the District Court confirmed the report of the Commissioner appointed in the proceeding and found the value of The Alaskan to be $983,250, 85 F.Supp. 815. While the appeal from the District Court's decision was pending in the United States Court of Appeals, Second Circuit, the government filed a motion in that court on January 2, 1950: "* * * for an order (1) remanding the cause for the taking of evidence and the making of findings required under the decision of the Supreme Court supervening after perfection of appeal from the decision below, United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, decided June 13, 1949; (2) directing the Court below to ascertain what part of the valuation fixed by that Court for the S. S. Alaskan represents (within the meaning of Section 902(a), Merchant Marine Act, 1936, as amended, 46 U.S.C.A. § 1242, 49 Stat. 2015, as amended by the Act of August 7, 1939, 53 Stat. 1254, and within the rule of United States v. Cors, supra) enhancement of value attributable to the Government's need for vessels which necessitated the taking, and enhancement of value attributable to the Government's intervention in the market for vessels prior to the taking in its effort to satisfy such need; * * *."

The affidavit of the Assistant Attorney General sworn to November 4, 1949, submitted in support of the motion states: "2. This proceeding presents the question whether in a case involving a claim for

just compensation for the taking of a vessel by the United States, where the record below was made on a theory of controlling law which, since the perfection of the appeal, has been fundamentally modified by the supervening decision of the Supreme Court in United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, for the first time construing the applicable statute, this Court should remand the case for the taking of evidence upon which alone this Court can make the findings required by the Supreme Court for a correct disposition of the case."

The motion was argued in the Court of Appeals on January 30th and on that day an order was entered "that said motion be and it hereby is denied; leave be and it hereby is granted to the District Court to hear the application".

On the same day the District Court heard the application, counsel presented their arguments thereon and briefs were submitted.

The government's motion is based on the assumption that the District Court applied a standard of valuation for The Alaskan that does not conform to the standard set forth in the majority opinion in United States v. Cors, 1949, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392. The government further contends that the District Court did not inquire whether any part of the just compensation awarded for The Alaskan was attributable to an enhancement in value due to the government's need of vessels which necessitated the taking of The Alaskan, and that the record made before the Commissioner and in the District Court is blank in respect of proof showing the extent of the government's intervention in the market, which allegedly resulted in an enhancement in value of The Alaskan.

The libelant, in opposing the motion, contends that the decision of the Supreme Court in the Cors case did not effect any change in the established judicial standards of just compensation so as to constitute a "supervening decision", and that the government cannot now seek to introduce evidence which was available to it at the time of the trial. The libelant further contends that the government did not, by any activities in the market for ships of the Alaskan type, create any inflationary or speculative increases in the market for vessels of that type, within the meaning of the deductible enhancement clause of Section 902, and that the record does contain evidence upon which the Court and the Commissioner could and did consider the question of any enhancement in value that might be attributable to any government needs which necessitated the taking.

The government's motion in the Court of Appeals was for a remand. Its application, at the direction of that court, to the District Court may be treated as a motion for a new trial or for relief from the final decree pursuant to Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, 28 U.S.C.A. For reasons hereinafter stated I have concluded that the application should be denied.

Section 902 of the Merchant Marine Act of 1936, Title 46 U.S.C.A. § 1242, providing for the requisition of vessels by the Maritime Commission "during any national emergency declared by proclamation of the President", provides in part in subdivision (a): "When any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use."

Subdivision (d) of the same section provides for a resolution of any controversy between an owner and the Commission on the issue of compensation as follows: "In all cases, the just compensation authorized by this section shall be determined and paid by the Commission as soon as practicable, but if the amount of just compensation determined by the Commission is unsatisfactory to the person entitled thereto, such person shall be paid 75 per centum of the amount so determined and shall be entitled to sue the United States to recover such further sum as, added to said 75 per centum will make up such amount as will be just

compensation therefor, in the manner provided for by sections 41(20) and 250 of Title 28."[1]

The enhancement clause also appears in the Rules of the Advisory Board on Just Compensation (consisting of Court of Appeals Judges L. Hand, Parker and Hutcheson) created by the President on October 15, 1943, by Executive Order 9387, to establish standards and rules for the guidance of the War Shipping Administration in determining the just compensation to be paid for requisitioned vessels. Rule 4 of the rules promulgated by the Advisory Board stated: "Rule 4.—From the value at the time of taking, there should be deducted any enhancement due, to the Government's need of vessels which has necessitated the taking, to the previous taking of vessels of a similar type, or to the prospective taking, reasonably probable, whether such need, taking, or prospect, occurred before or after the declaration of the national emergency of May 27, 1941. Enhancement due to a general rise in prices or earnings, whenever occurring, should not be deducted. In the application of this rule neither the proclamation of limited emergency of September 8, 1939, nor the facts existing at that time, are in themselves of significance."

The principle of deducting any enhancement of value of requisitioned property due to the government's need which necessitates the taking, is discussed in the decision of the Supreme Court in United States v. Cors, 1949, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, decided after the entry of the final decree in this case. The government had requisitioned a steam tug (The MacArthur) in October 1942 and the owner, Cors, brought an action for just compensation. The Court of Claims found that the market value of the vessel had been enhanced because of greatly increased harbor traffic during the war and by the government's requisitioning of tugs, resulting in a shortage; but the Court of Claims affirmatively declined to deduct from the market value of The MacArthur any enhancement in value due to such causes. On appeal the Supreme Court did not consider the constitutionality of the enhancement clause of Section 902 of the Act in all its aspects or applications, but held that the clause was consistent and "coterminous" with the prior judicial standards of just compensation which should be applied to the facts in the Cors case, and that enhancement in value due to the government's need was an element to be excluded from market value in determining just compensation to the taker, the same as any special value to the owner should be excluded in determining just compensation. These latter exceptions were stated as part of the judicial standard of just compensation by the Supreme Court in United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063, and United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55. In the Cors case the court held that the deductible enhancement was an illustration of the principles inherent in the doctrine which had previously required its exclusion in the Chandler and Miller cases. The Court stated the exception as follows: "In time of war or other national emergency the demand of the government for an article or commodity often causes the market to be an unfair indication of value. The special needs of the government create a demand that outruns the supply. The market, sensitive to the bullish pressure, responds with a spiraling of prices. The normal market price for the commodity becomes inflated. And so the market value of the commodity is enhanced by the special need which the government has for it." [337 U.S. 325, 69 S.Ct. 1091.]

All the Cors case held was that the Court of Claims was in error in including in the market value of the tug an enhancement in value due to "the Government's need for vessels, which necessitated the taking of many vessels and to the great increase in shipping and in harbor traffic" during the

[1]. Providing for suits against the United States in the District Court or the Court of Claims [1948 Revised Judicial Code, 28 U.S.C.A. §§ 1346, 1491 et seq.].

war.[2] The Supreme Court held that since the Court of Claims findings "tell us [the Supreme Court] that some of the enhancement in market value is due to the government's need" and was erroneously included in the award, and since they [the Supreme Court] were "left in the dark as to how much it may be", it was necessary to send the case back to the Court of Claims for more "discriminating" findings and for a revaluation which would exclude any increase in the market value of the tug due to the government's needs. The decision of the Court of Claims was accordingly reversed and the cause was remanded.

At the time of the decision of the District Court in the proceeding at bar the rule of the Chandler and Miller cases had been enunciated, the same rule had been enacted in Section 902 of the Merchant Marine Act, and the Rules of the Advisory Board, which were expressly stated to be in accord with the judicial standards, United States v. Cors, supra, 337, U.S. 334, 69 S.Ct. 1086, 93 L.Ed. 1392, were promulgated. Both this court and the Commissioner considered the statute and the Rules of the Advisory Board. Concerning the Rules the Commissioner said: "These rules embody established legal principles which should not only govern the action of the War Shipping Administration but should be here applied in the determination of the present issues."

In this respect the Court stated [85 F.Supp. 815, 820]:

"The Commissioner in the case at bar, properly gave due consideration to the Rules formulated by the Advisory Board.

\* \* \* \* \* \*

"The Commissioner gave due consideration to Rules 1, 3 and 4 of the Advisory, Board on Just Compensation, which he

quotes.[3] His report shows that 'enhancement' due to a general rise in prices or earnings was not deducted from the value at the time of taking, but that any enhancement due to the Government's need was deducted."

In these circumstances, United States v. Cors supra, does not constitute a "supervening decision". The principle of law therein involved had been enunciated in prior Supreme Court decisions, and had been embodied in the statute and in the Rules of the Advisory Board, all of which were duly considered by the District Court and the Commissioner in the case at bar. Respondent's motion, in so far as it rests upon the contention that the Cors decision is a "supervening decision" does not withstand a careful analysis.

A second reason for denying the government's motion is the fact that the government's contention that the record in the case at bar lacks any evidence upon which the District Court could have considered the extent of the government's intervention in the market, in passing on the question of deductible "enhancement", is without merit. The government's contention is stated in its brief as follows: "Without the additional findings and the additional evidence \* \* \*, the record will not permit this Court to decide whether the value fixed for The Alaskan contains elements of forbidden enhancement as now defined by the Supreme Court."

Exhibit 41, a "Statement of Rear Admiral Emory S. Land, Administrator, War Shipping Administration", made June 10, 1943, contains the following:

"High profits were earned in 1941, before we became involved in the war; but these high profits are now a thing of the past.

"It is not possible to allocate to the second cause a definite part of the increase in market value, but even if it were possible to do so, we do not think the defendant is entitled to a deduction from market value on this account."

2. 75 F.Supp. 235, at page 237, 110 Ct.Cl. 66, where the Court stated:

"We have found that the increase in the market value of this vessel was due, first, to the great increase in shipping and harbor traffic due to the war and, second, to the Government's need for vessels in the prosecution of the war, which necessitated the requisitioning of many of them.

3. The court quoted Rules 1, 3 and 4 of the Advisory Board in a footnote.

"Generally speaking, the 1941 prosperity was not based on moneys received from the United States Government, for we were then at peace and had not requisitioned our merchant fleet, but rather on the great improvement in the steamship business in that year, which was worldwide in scope. The history of the steamship industry indicates that those peak periods occur once in 10 or 20 years.

*    *    *    *    *    *

"Since the middle of 1939, there have been six distinct phases in the fluctuations of ship values and earnings. In late 1940 and early 1941 before we became involved in the war, vessel earnings and values reached extraordinary high and uncontrolled levels. * * *

"The third quarter of 1939 may be considered prewar, although early September marked the beginning of hostilities in Europe. * * * The shipping industry was then suffering from a greatly overtonnage situation. The surplus was worldwide in scope. It had a particularly depressing effect on domestic market values * * *.

"Fortunately, employment was found for the ships in a short time, and the crisis was over by the spring of 1940. The British were withdrawing their ships from commercial routes to India and the Far East, and arrangements were made for the substitution of American-flag ships on those and other long voyage routes.

*    *    *    *    *    *

"From December 1940 to July 1941 there was a marked rise in charter rates and ship values. This is the fourth stage of the sequence. Shipping space was hard to get. Water-borne transportation was at a premium. The strategic worth of vessels to war had begun to make itself felt unmistakably. By the time of the President's proclamation of unlimited national emergency on May 27, 1941 [No. 2487, 50 U.S.C.A.Appendix preceding section 1], the process of spiraling rates and prices was in full swing. It was not brought under control until July, when the Ship Warrants' Act [55 Stat. 591, 50 U.S.C.A.Appendix, § 1281 et seq.] was passed.

"In the meantime the need of the Government for water-borne transportation to support the national defense effort was increased, and contributed to the scarcity of shipping space.

*    *    *    *    *    *

" * * * the Maritime Commission determined not to resort to requisition, even after May 27, 1941, but to continue operations under private ownership until such time as its efforts to reduce and stabilize rates and values should produce results or the need for requisitioning should become clearer and more pressing.

*    *    *    *    *    *

"The causes necessitating the taking or use were, according to our interpretation, the need of the United States for water-borne transportation in furtherance of the national interests. That need in the sense of commandeering or even of control, did not become clear until the spring of 1941.

*    *    *    *    *    *

"Nearly 4000 ships have been purchased, chartered or requisitioned by the War Shipping Administration. More than 90 percent of them were taken after Pearl Harbor [December 7, 1941]."

While there is some evidence that the increases in charter rates and ship values subsequent to December 1940 were attributable in a general way to the "effects of war economy upon shipping", the statements made by Admiral Land on June 10, 1943 to the House of Representatives Committee on the Merchant Marine and Fisheries, constitute precise and substantial record evidence that the enhancement in ship values prior to May 27, 1941 was attributable to world-wide industry and economic factors rather than to the government's particular need which subsequently necessitated the taking of The Alaskan.

Another exhibit, No. 40, a "Compilation of Material on the Determination and Payment of Just Compensation for Vessels Requisitioned under Section 902 of the Merchant Marine Act, 1936", referred to as Document 20, was prepared by the War Shipping Administration, was referred to by Admiral Land in his testimony before the House Committee, and was made a part of the record of the hearing before the

Committee. The following is quoted from Document 20:

"In 1939 ship values were low. Thereafter, during the period up to May 1941, there was a very considerable increase in market values of ships. There was an established market, because ships were bought and sold by private owners. During that period the Government did not attempt to control or limit in any way ship prices. They grew larger through the operation of the laws of supply and demand.

$*$ $*$ $*$ $*$ $*$ $*$

"The first requisitions were in August 1941, when a few were so acquired. Not till April 1942 were ships requisitioned in considerable numbers.

"No cause or condition necessitating ship requisition was known or thought to exist prior to April 1941, when the Commission, reporting to the House Committee on Merchant Marine, said: 'The United States urgently needs more ocean-going tonnage. It needs it for its foreign commerce and for its national defense program. It must now try to fill needs not reasonably foreseen a few months or even a few weeks ago, and certainly not in their present scope and intensity'.

$*$ $*$ $*$ $*$ $*$ $*$

"It is estimated that approximately 30,-000 vessels of all types and sizes were subject to requisition under the Merchant Marine Act, 1936, and of these nearly 4,-000 have heretofore been either requisitioned, chartered or purchased. Over 90 per cent of these vessels were acquired after the outbreak of the war on December 7, 1941. Of these, approximately 2,500 are small craft, such as fishing vessels, yachts, tugs, barges, and harbor craft, while approximately 1,500 are large vessels, such as freighters, tankers, and passenger ships. (P. 191.)

$*$ $*$ $*$ $*$ $*$ $*$

"The actual necessity for taking vessels did not develop until the United States Government needed the vessels and this need for vessels, as hereinafter indicated, began to develop only in the latter part of 1940 when the United States Government began to purchase or charter vessels in connection with the rearmament program. Further, the initial need was a limited one which did not grow to major proportions until the end of 1941, after a national emergency had been declared, and the program of lend-lease assistance got under way on a large scale. Requisitioning of vessels did not commence until August of 1941, and less than 25 vessels were requisitioned during that year. General requisitioning did not take place until 1942. (P. 198.)

$*$ $*$ $*$ $*$ $*$ $*$

"The need of the United States for water-borne transportation to serve national purposes can be discerned as it developed. The need arose for some types of vessels before there was any need for other types of watercraft. The effects of the needs as they arose can be seen and fairly well determined. The late development of the need is shown by the fact that less than 25 large vessels were requisitioned in 1941, while over 1,250 such vessels were requisitioned in 1942. The need was based on war requirements which alone necessitated the taking. On this basis, the enhancement of ship values resulting from the causes necessitating the taking can be ascertained. No other yardstick for determining such enhancement will serve the purpose as well." (P. 201.)

The record of the testimony of Mr. Haight, an expert witness for the libelant, in relation to shipping in World War II period, contains the following:

"Q. When you said 'increased demand for ships', how do you measure that? A. Well, it can be measured by the scattering sales of a few ships soaring to almost astronomical figures,—ships bought by the Irish Free State, ships taken over by the Argentine government, scattering sales which could not be assumed to make a market, but nevertheless is an indication of how strong the demand was for ships when they could be gotten.

"Q. With respect to the scattering sales you referred to, are they all sales of vessels from warring powers to neutral powers? A. I think so.

"Q. Could American flag vessels during 1942 be freely sold by American owners to

citizens of other countries? A. I think not.

"Q. And the scarcity of demand which would be represented by such sales would represent a scarcity in the neutral powers; is that correct, or in neutral countries? A. I think it indicates a world scarcity.

"Q. Would sales to neutrals necessarily indicate a world scarcity, or would it indicate a scarcity among neutrals? A. The high prices paid by neutrals for those ships indicates world scarcity." (P. 799.)

Mr. Sturm, an expert witness for the government, testified that there was a definite market for vessels in 1941. "I do know what the market was in 1941 just prior to the time all these restrictions were put on; and in 1942, with all those restrictions on the ship owners, the prospective buyer wouldn't be willing to pay more, but would pay less, because he had these restrictions, and also the threat of requisitioning by the Government." (P. 1024.)

Two other excerpts from the testimony of Mr. Sturm are quoted as follows:

"Q. Mr. Sturm, from your connection with the Maritime Commission and your knowledge of the sales situation, isn't it a fact that after the first half of 1941, the Maritime Commission, in general, ceased giving approval to sales of American vessels to foreign buyers? A. I believe that is true.

"Q. So that 1941 falls into two parts: the first half, when there was an opportunity for American owners to sell to foreign buyers; and the second half, when there was no such opportunity? Isn't that right? A. Yes, I believe so. (P. 1049.)

\* \* \* \* \* \*

"Q. Isn't it a fact, Mr. Sturm, that in 1941, the Maritime Commission disposed of the last of the laid-up fleet, that is, the fleet that was surplus in the First World War? A. Yes.

"Q. Those were finally absorbed in that year? A. That's right.

"Q. That occurred early in 1941, did it, or some time in the first half of 1941? A. I believe so.

"Q. As far as you know, there were no surplus vessels for sale in the United States after that laid-up fleet was disposed of, except such as were in private hands? A. That's right. The Maritime Commission had sold everything they had, laid-up." (P. 1086.)

The above quotations from Exhibits 40 and 41, and from the testimony of Mr. Haight and of Mr. Sturm, constitute credible evidence that the scarcity of ships up to and including the first half of 1941 was a world-wide scarcity caused by world-wide economic and political factors, and that the increased values of vessels during that period are attributable to the natural operation of those conditions on the laws of supply and demand. It further appears from this evidence that the requisitioning program of the government was not initiated until August 1941, and that no "cause or condition necessitating ship requisition" existed prior to May 1941, and that the need thereafter was a limited one until the end of 1941. This constitutes record evidence on the question of "enhancement" —sufficient to find that no deductible "enhancement", within the meaning of Section 902 and the Cors decision, existed prior to May of 1941.[4] The sale prices of vessels

4. This conclusion is the same as that reached in the Cors case upon which the government relies on this motion. The finding on this issue was: "Beginning on September 8, 1939, the date on which the President proclaimed the existence of a limited national emergency, and continuing up to the date that plaintiff's vessel was requisitioned, there was a general rise in the market values of nearly all vessels in and about the Port of New York. This increase in values between September 8, 1939 and May 27, 1941, the date on which the President proclaimed the existence of a general national emergency, was due to the demand for vessels which followed the outbreak of war in Europe. After May 27, 1941 and particularly after December 7, 1941, the date of the Japanese attack on Pearl Harbor, the rise in market values was due to the Government's need for vessels, which necessitated the taking of many vessels, and to the great increase in shipping and in harbor traffic which occurred during the period of the war." (P. 329.)

in 1941, upon which the Commissioner relied in determining a market value for vessels of The Alaskan type in 1941, were sales in December 1940 and April of 1941 (prior to May 1941) and the record in this case shows that a "deductible enhancement" based on any government need did not exist prior to that date. The record in this case refutes the government's contention on this motion that there is no evidence which would enable the court to consider the extent of the government's intervention in the market, and the effect of such intervention on the enhancement of values for vessels of The Alaskan type.

The evidence which the government would now offer may be classified as follows: matters that were subject to judicial notice at the time of trial; matters already in the record in some other form; additional matter which would show the extent of the government's activities in the market from September 1939 on, as a shipper or berth or space charterer. This additional matter is of doubtful relevancy and would have no probative value on the issue, because it is not precise and limited to the kind of market in which The Alaskan would have to be valued to determine just compensation for her taking. Some of the additional evidence which the government would offer consists of records of sales by the government of surplus or laid-up vessels, and political and legislative matter, which would tend to decrease, not increase, ship values.

In United States v. Cors, 337 U.S. 325, 334, 69 S.Ct. 1086, 1091, 93 L.Ed. 1392, the Court held: "The government's need of vessels which has necessitated the taking is its need for the precise ship taken, * * * or for ships which perform the same or related functions. The government's need for cargo vessels may affect indirectly the price level of many commodities. It may, for example, affect the price of rowboats. But if the government takes a rowboat, the enhancement to be excluded is that which results from the government's activities in the particular market. It is the government's demand in that market

that is the measure of the 'causes necessitating the taking or use' in this situation."

■ Assuming that a basis for reopening this proceeding were established, this additional evidence would not, in my opinion, change the result of the original proceeding. In such circumstances the Court's discretion should be exercised against granting the application. Marshall's U. S. Auto Supply v. Cashman, 10 Cir., 1940, 111 F.2d 140; Moore's Federal Practice, 1948 Supp., § 59.02, n. 14.

■ Further, this additional evidence, now sought to be presented, was available to the government at the time of the hearings in this action. The government's trial counsel was able and experienced. He turned in a highly creditable brief in support of the exceptions he filed to the Commissioner's report. It seems to me that the government's appeal counsel believe that its trial counsel would have achieved better results if he had made some of the contentions and offered the additional evidence which they now proffer. But that is no reason for granting an application of this kind. The government has had its day in the trial court and as a litigant is entitled to no more. See Merchants' Banking Co. v. Cargo of the Afton, 2 Cir., 134 F. 727, at page 731; and Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, at page 424, 43 S.Ct. 458, 67 L.Ed. 719.

■ Brief reference to the opinion of the Court and the Commissioner will suffice to point out the error of the government's final contention, that the court and the Commissioner did not apply the "enhancement" clause. At pages 6 and 7 of his report the Commissioner quoted in full, Rules 1, 3 and 4 of the Rules of the Advisory Board which specifically state the rule in relation to deductible enhancement as applied by the Supreme Court in the Cors case. In this connection he stated that the rules embodied established legal principles which "should be here applied". He also stated, in connection with discounting the values in 1942: "There seems moreover, an additional reason why the

1942 value should not be considered. The enhancement clause of Section 902 by which this proceeding is governed provides that, 'In no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use.' "

In the District Court the government's exceptions to the Commissioner's Report include: "7. The Commissioner improperly deemed the value of The Alaskan to have been enhanced by causes necessitating her taking and use by the Government and improperly awarded the libelant an amount including such enhancement."

This exception was considered and specifically overruled by the District Court. The court also found that the Commissioner had given due consideration to Rules 1, 3 and 4 of the Advisory Board. The court quoted the Rules and referring to the question of enhancement stated: "His [the Commissioner's] report shows that 'enhancement' due to a general rise in prices or earnings was not deducted from the value at the time of taking, but that any enhancement due to the Government's need was deducted."

To sum up: The Cors case does not constitute a "supervening decision" with respect to the decision of the District Court in the instant case; the record in this case contains a substantial amount of evidence on the question of deductible "enhancement" within the language of Section 902 of the Merchant Marine Act of 1936; the government has failed to show any reason why the evidence it now seeks to present, which bears the infirmity of doubtful relevancy, was not presented at the original hearing in this case; the District Court and the Commissioner gave due consideration to the rule of deductible enhancement as stated in the Miller and Cors decisions, supra, in Section 902 of the Merchant Marine Act of 1936, and in Rules 1 and 4 of the Rules of the Advisory Board. The government's motion to reopen the proceeding and present further evidence is accordingly denied.