**UNITED STATES of America,
Plaintiff,**

v.

**117,763.00 ACRES OF LAND IN IMPERIAL COUNTY, CALIFORNIA, etc., et al., Defendants.**

**Civ. No. 70–200–S.**

United States District Court,
S. D. California.

April 9, 1976.

Ernestine T. Tolin, Sp. Asst. to the U. S. Atty., Los Angeles, Cal., for plaintiff.

Thoms P. Gilfoy, and Oliver, Stoever & Laskin, a Professional Corporation, Los Angeles, Cal., for defendants.

## OPINION AND ORDER

RUSSELL E. SMITH, District Judge.

This case poses the problem—what is just compensation for the taking by condemnation of a one-year lease with options to renew for four additional years on lands which, except for the purposes of the taking, are almost useless? The background out of which the problem arises is as follows:

The United States established the Chocolate Mountain Aerial Gunnery Range during World War II and has possessed the privately-owned lands within it by voluntary leases or condemnation ever since.

According to the appraisers for the defendants and the Government, the highest and best use of the land is for speculative purposes. Evidence was introduced showing a substantial number of sales by and to speculators. A market has been established. It is not contended that any substantial part of the land is valuable for any productive use, except as a gunnery range, and the evidence, supported by an aerial inspection of the lands, discloses that they are virtually worthless. The lands are located in Imperial County, California, and lie north and east of El Centro, California, at about the latitude of the Salton Sea. All the lands taken are desert lands—rock and sand. The summer temperatures are so high that Navy pilots flying over the area wear gloves to keep their hands from burning.

Some of the land is level and some mountainous. The proportions of the level land and mountainous land are not shown, but a topographical map in evidence indicates that probably the greatest part of the lands is in the mountains. The mountains are rock. There are no roads in them. There is no vegetation on them. The terrain is both rough and steep. The mountains are useless except for the purposes of the taking.

The level lands are rock and sand, cut by dry gulches. The rainfall is 2 to 4 inches per year and supports a sparse growth of desert shrubs and cacti. There is no evidence that there is any available water on the lands taken, although a well was dug near the taking in conjunction with an abandoned mining claim. There is no evidence that water for irrigation or domestic use will become available at any time. The level land has two possible uses: One, it is conceivable that the level land could be leased for grazing. Lands to the north and east of the range have been leased in previous years for grazing at from ½ cents to 4 cents per acre. It is evident that grazing in these lands would be limited to a very brief period following the rains. Two, some parts of the level land near the roads could be used as cabin sites or for the parking of campers, trailers, or mobile homes. Some persons who love the desert and who are willing to haul domestic water might be attracted to these sites. An aerial inspection indicates that very few persons are now making this use of any lands in the vicinity. Whether for the purposes of such use these desert-lovers would pay money to buy or rent, in view of the fact that there are thousands upon thousands of vacant acres of the same kind in the vicinity, is conjectural, and it is not suggested, either by the evidence or by argument, that there is any market either for rental or for sale for such purposes.

Defendants did produce evidence of one lease of 360 acres in the Mojave Desert for use as a storage site for explosives at a rental of $1020.00 per year. Were that land shown to be comparable to the lands here involved, an isolated transaction involving a small acreage and an extraordinary purpose would not establish a rental market for desert lands in general or these lands in particular. The award here made is ample to compensate defendants for any loss of some unexpected rental for some very special purpose.

It is not claimed and the record does not show that the defendants lost an opportunity to make favorable sales of their land by reason of the existence of the leases. In fact, what evidence there is tends to show that the existence of the leases did not affect the sale of land within the range. Defendants bought their land while it was subject to a prior lease. In any event, there is no evidence on which damages based on such a theory could be calculated.

The defendants' expert determined the fair yearly rental for the use of the land to be 8% of the market value of the land, or $19,133.00. The value of the

right to renew for four years was fixed at 60% of the rental value for one year.

In support of this method of determining just compensation for the use of the lands, defendants argue that, since there is no evidence of leases or rentals from which the market value of a temporary use may be determined, recourse must be had to some other method of ascertaining value. This rule is often applied in cases where property, such as a church and cemetery, has a substantial use value but is not commonly traded. See 27 Am.Jur.2d *Eminent Domain* § 281 (1966). Defendants' expert testified that his method of determining value is commonly used where temporary easements in lands are taken. Defendants cite, in support of their position, *In re Condemnation of Lands for Military Camp*, 250 F. 314 (E.D.Ark.1918).

The defendants have the burden of proving their damages.[1] The defendants are bound to start with the fact that the land taken has no proved use except as a gunnery range, which use cannot be considered here.[2]

I reject the defendants' appraisal for two reasons:

First, the only proved use of lands elsewhere in the vicinity is minimal use for grazing purposes. The fact that there is no proof of a market for a particular kind of property does not permit the Government to take useful property for nothing, but there is no rule that, where what is taken has a minimal value, something more than that value must be allowed. There is a vast difference between the taking of property which has a substantial use value even though that use is not generally traded (such as a church) and property the use of which is not generally traded because there is no substantial use (such as this gunnery range). I find that the method of valuation chosen by the defendants bears no relationship to a fair market value of the use and that such method of valuation should not be employed here.[3]

Second, the market value of these lands is not the kind of a market value on which a condemnation award should be based. Both experts agree that the highest and best use of the land is for speculative purposes. There is no doubt that speculators have traded in the land and have, in that sense, established a market at values far greater than any actual use of the land would warrant. Neither expert postulated any ultimate use. The evidence was that the buyers did not distinguish between the mountainous land and the level land, or between the lands in the gunnery range and subject to the Government's use and the lands out of the range. A great majority of the buyers had not seen the land before buying. In all of the data of comparable sales prepared by the witnesses for both sides, there is not one indication that a single tract has been improved by buildings or otherwise.

---

1. *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943).

2. In *Carlstrom v. United States*, 275 F.2d 802, at 809 (9th Cir. 1960), the court, quoting from *United States v. Cors*, 337 U.S. 325, 333–34, 69 S.Ct. 1086, 1090–1091, 93 L.Ed. 1392, 1399–1400 (1949), said:
   "It is not fair that the government be required to pay the enhanced price which its demand alone has created. That enhancement reflects elements of the value that was created by the urgency of its need for the article. It does not reflect what 'a willing buyer would pay in cash to a willing seller,' *United States v. Miller*, supra, 317 U.S. [369] 374, 63 S.Ct. [276] 280, 87 L.Ed. 336, in a fair market. It represents what can be exacted from the government whose demands in the emergency have created a sellers' market. In this situation, as in the case of land included in a proposed project of the government, the enhanced value reflects speculation as to what the government can be compelled to pay. That is a hold-up value, not a fair market value. That is a value which the government itself created and hence in fairness should not be required to pay."

3. I do not know if *In re Condemnation of Lands for Military Camp, supra,* is contrary because the opinion describes the land there involved as wild land without more. If the opinion stands for the proposition that, regardless of the use value of land, the owner, in a case where a temporary use is taken, is entitled to a fair return based on market value, then I refuse to follow it.

There is no indication that any owner of a comparable tract is making any use of it. This suggests that, in terms of value based on potential use, the trading has been completely indiscriminate.

■ If the market value of land is based on speculation, then it is proper in determining just compensation to ask on what the speculation depends. Does it depend upon an appraisal of the land in terms of its uses and a forecast of what the needs of a growing and shifting population for those uses will be? Or does it depend upon the thesis that there's a sucker born every minute and that, if the large tracts of land are broken into smaller tracts, sooner or later the land can be sold at a profit even if it has no value? In this case I find that there is no possibility that the lands taken will be sold in the foreseeable future to fill some need that people will have for any use to which these lands may be put. It may be that these lands could be sold for something other than resale to people who knew the whole truth about them, but the defendants, who have the burden of proof, have not proved that, and I conclude from the whole record that these lands will not be sold to any ultimate user if the whole truth about them is disclosed.[4]

■ In what has been said I have related market value to some potential use of the land. If it be envisaged that ultimate use plays no part in the present speculation in these lands and that each speculator buys with the thought that he can sell to another speculator at a higher price, then the whole thing becomes a game of wits with someone at the end of the trading chain losing. The Government should not, by reason of its needs for the land, be forced to be a participant in that game of wits whether it takes a temporary use or the fee.

The Government's expert based his appraisal of just compensation on what he termed the "bundle of rights" theory. The market value of the land is the value of the whole bundle of rights. The bundle was broken down into the rights to enhancement, to enter, to physical use, to receive rent, and to reversion. The witness determined that only the right to enter and the right to physical use had been taken. He valued the right to physical use at 1½ cents per acre per year and the right to enter at 5½% of 15% of the speculative value of the land (as he determined it), plus one-half of the taxes, per year. On this basis he determined the value of the yearly rental to be $2,967.00 and the value of the right to renew to be about 78% of the yearly rental, or $2,359.00.

■ This evidence on behalf of the Government was given orally and in a

---

4. A brochure telling the whole truth about the land would read something like this:

You are about to become the owner of a tract of land in or near the Chocolate Mountains. The land is desert—rocks and sand. It is very hot in the summer, there is no presently-known source of water, and there is no indication that water for domestic use or irrigation will ever be available. There are no known minerals. Some lands in the vicinity have been used for grazing at a few cents an acre, but it is unlikely that you could lease a small tract. If you should purchase a tract we will locate it for you on the map, but since a map won't tell you much about the land, we suggest that you drive to Indio, California, and hire a surveyor who, for a fee, will help you find the land and get the boundaries marked. We suggest that when you make your inspection you bring some cans to carry a supply of water and that you make arrangements for a four-wheel-drive vehicle because most of the lands are not near roads. While in the area you might well explore with appropriate public officials the possibility of new roads. We also suggest that you bring some stout hiking boots and a canteen because even your four-wheel-drive vehicle will not get you to much of the land in the area. We particularly stress the need of an inspection because your land might be on a mountain without enough level ground to pitch a tent, and if you are interested in living on the land, you might not like the site we have marked for you. If the tract marked on the map turns out to be land you don't want, call us from Indio and we will suggest another piece which your surveyor may help you find. Of course, if you want a piece of desert and don't care how hot it is or whether the wind blows or whether it is worthless or whether you can find it, and if so, whether you can get to it without walking, probably no inspection is necessary.

written exhibit. It appears in substantially the same form in the pretrial proceedings, and without regard to the validity of the method of appraisal, I consider the evidence to be usable against the Government as an admission by adoption.[5] If in principle a finding may rest on the testimony given in a former suit, a finding may also rest upon evidence given in the case at issue.[6]

I find the value of yearly use to be $2,967.00 and the value of the right to renew to be $2,359.00.

This opinion constitutes the findings of fact and conclusions of law of the court.

Plaintiff will prepare a proposed judgment reflecting these findings and serve the same on the defendants, who will have ten (10) days within which to file objections to the judgment.

5. "When a party offers in evidence a deposition or an affidavit to prove the matters stated therein, he knows or should know the contents of the writing so offered, and presumably he desires that all of the contents be considered on his behalf, since he is at liberty to offer only part, if he desires. Accordingly, it is reasonable to conclude that the writing so introduced may in another suit be used against him as an adoptive admission. In respect to oral testimony, however, the inference of sponsorship of the statements is not always so clear, but here, too, circumstances may justify the conclusion that when the proponent placed the witness on the stand to prove a particular fact, and the witness so testified, this was an adoptive admission of the fact in a later suit." (Footnote omitted.) McCormick on Evidence § 269, at 650–51 (2d ed. 1972). In the ordinary application of the rule, the adoptive admission is used in a subsequent suit.

6. I base my finding on the admission because, apart from it, I would not on the evidence reach as high a value as did the Government's expert. He used the speculative market as a basis for his calculation, which I deem to be improper. Apart from the admission I would find a value based on the proved grazing leases at a rental of about 1½ cents per acre per year.