UNITED STATES v. 620.00 ACRES OF LAND, MORE OR LESS, SITUATE IN MARION COUNTY, ARK. et al.

Civ. No. 203.

United States District Court
W. D. Arkansas, Harrison Division.

Jan. 3, 1952.

R. S. Wilson, U. S. Atty., Hugh M. Bland, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

J. Smith Henley and Willis & Walker, all of Harrison, Ark., Jack Holt, Little Rock, Ark., for defendants.

JOHN E. MILLER, District Judge.

The tract in question consists of 40 acres of land in Marion County, Arkansas. It was taken by the Government on December 8, 1947, for use in connection with the Bull Shoals Dam and Reservoir Project. The Government obtained from this tract a large proportion of the stone that was used in making the concrete that went into the Bull Shoals Dam.

A controversy arose between the Government and the defendant landowner as to just compensation for the tract, which controversy was tried to a jury on September 24 through September 27, 1951. The defendant's testimony as to just compensation ranged from $400,000.00 to $600,000.00, whereas the Government's testimony was $800.00. This difference is accounted for by the fact that the defendant's witnesses valued the tract on the basis of the limestone deposits thereon, while the Government's witness did not consider the presence of such deposits as enhancing its market value. The jury returned a verdict for $60,000.00, and subsequently the Government filed a motion for a new trial. This motion is now before the court for determination.

The court has broad powers in the disposition of a motion for a new trial. Thus, while due respect should be accorded the findings of the jury, the court should set aside the verdict and grant a new trial in any case where, from a consideration of all the facts and circumstances pertaining to the trial, the court is convinced that the

ends of justice so require. This may be done even though there is substantial evidence to support the jury's findings, which, of course, would preclude the granting of a directed verdict. As expressed by Judge Parker in Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 122 F.2d 350, 352: "On such a motion [motion for a new trial] it is the duty of the judge to set aside the verdict and grant a new trial, if he is of opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. The exercise of this power is not in derogation of the right of trial by jury but is one of the historic safeguards of that right."

And, at page 354 of 122 F.2d: "To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require."

In Montgomery Ward & Company v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147, the court stated: "The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; * * *." See, also: Charles v. Norfolk & Western Ry. Co., 7 Cir., 188 F.2d 691, 695.

With these principles in mind the court now turns to a consideration of the law and the testimony to determine whether the ends of justice require that a new trial be granted.

In support of the landowner's theory that the most valuable use of the land was for quarrying of rock, and that she was entitled to compensation based upon the value of the tract for that use, testimony was introduced substantially as follows:

Loyne Hurst, son of the deceased owner, testified that he and his father had considered setting up a quarry on the tract as early as 1937, but the war came on and prevented their doing so. The plan called for a crusher and a dehydrating plant on a large-scale operation.

Howard Miller, a geologist, described the rock deposits on the tract and testified that the Everton formation, from which was obtained the rock used in the construction of the dam, could be used for road materials, ballast, agricultural lime and for nearly any use that requires a hard uniform stone. He further stated that "There is a considerable market for revetment work along the Mississippi," and "I do not know of any quarries of any considerable size within the State of Arkansas that have been unable to sell all of the stone that is produced." In his opinion the fair market value of the tract was $600,000.00 on December 8, 1947, arrived at as follows: "In arriving at my $600,000.00 figure, I estimated the limestone in place on the Hurst tract was worth around fifteen cents a ton royalty. Limestone is purchased that way. Stone for quarry purposes is bought by the ton in the ground and paid as royalty and not as an acre proposition. I figured that a figure of fifteen cents a ton for this rock with 4,750,000 tons of rock would amount to around $600,000.00. What I mean to say is that we would take a lease and agree to pay fifteen cents royalty as we mine it. This would be on a twenty or twenty-five year basis. A commercial stone quarry has to have an adequate supply of rock that would last around twenty to twenty-five years before you can put in an investment of $300,000.00, $250,000.00, or $350,000.00, or whatever it takes to do the job. I am saying that the owner of that land out there could expect to realize $600,000.00 in royalty if he leased it for a quarry site and if they mined all of the rock in twenty-five years. My opinion is not based on market value of what the land would sell for in 1947 and it wouldn't make any difference how much acreage that was in it as long as it had rock in it."

R. M. Traylor testified that in his opinion the tract was worth between four and five

hundred thousand dollars. "I would not go out and purchase that fellow's property and pay $400,000.00 or its equivalent, but I arrived at my value by paying it in royalty." "I think it would cost about $250,000.00 to set up a plant out there."

B. C. Johnson testified to a value of between $450,000.00 and $500,000.00, and that his figure takes into consideration that it would be paid out in royalty over a period of years. In his opinion it would take from ten to fifteen years to mine the deposit.

H. L. Dickerson testified that he was engaged in the sand, gravel and general contracting business and had been for thirty-five years, and that the market for the kind of stone on this tract had accelerated for the last ten or twelve years.

For the Government, Bernard W. Cline testified that the fair market value of the land was $800.00, and "I did not take into consideration any value it might have for stone."

Raymond E. Whitle testified that "there are no quarries operating in this vicinity on a large scale basis", and "small operators operate by truck, but stone from this tract could not be operated by truck and there was no market for the stone in 1947."

Dr. Oliver Bowles testified that the records of the U. S. Bureau of Mines show that limestone production is a very small industry in Arkansas. The annual production for the years 1944 to 1948 was about 140,000 tons a year. A book by George C. Branner called "Limestones of Northern Arkansas" reveals that during the period 1923 to 1939 Marion County produced only 1500 tons which is about one-tenth of one percent of the state total. There was no considerable increase of production of stone in Arkansas from 1939 to 1947. "The most successful quarries are those that are located near centers of large consumption where there are big highway projects and public works and populous centers where sidewalks and buildings are being built. Limestone on Tract No. Quarry 5 has no commercial value whatever because there is no market for it nor was there in 1947 any prospect of a market within a reasonable period of time."

■ In submitting the case to the jury the court instructed that they could not consider any enhancement which may have occurred because the land was taken by the Government, or any demands for stone and other materials that were created by the Government's need for stone and materials in connection with the construction of the Bull Shoals Dam. This is in accordance with the applicable decisions of the Supreme Court. Thus, in United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336, the court stated: "Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker. Thus although the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value."

And, in United States v. Cors, 337 U.S. 325, 333, 69 S.Ct. 1086, 1091, 93 L.Ed. 1392: "It is not fair that the government be required to pay the enhanced price which its demand alone has created. That enhancement reflects elements of the value that was created by the urgency of its need for the article. It does not reflect what 'a willing buyer would pay in cash to a willing seller,' United States v. Miller, supra, 317 U.S. 374, 63 S.Ct. [276] 280, 87 L.Ed. 336, in a fair market. It represents what can be exacted from the government whose demands in the emergency have created a sellers' market. In this situation, as in the case of land included in a proposed project of the government, the enhanced value reflects speculation as to what the government can be compelled to pay. That is a hold-up value, not a fair market value. That is a value which the government itself created and hence in fairness should not be required to pay."

■ Evidence as to the quantity and quality of limestone deposits was relevant and material, and, therefore, to be considered by the jury, only in so far as it affected the fair market value of the property on the date of taking. That is, how it affected the price that a willing buyer would pay in cash or its equivalent to a willing seller. Such a result would necessarily

depend upon whether the property was reasonably suitable as a quarry site and whether there was an existing market for the stone, or if not, whether such a market was so reasonably probable as to have an effect upon the market value of the land at that time. As stated in United States v. Foster, 8 Cir., 131 F.2d 3, 5: "In determining the value of land taken by eminent domain, the jury may consider all uses to which it is adapted and might be put, and may award compensation upon the basis of its most advantageous and valuable use. To warrant the admission of testimony as to value for purposes other than that for which it is actually used, however, regard must be had for the existing conditions and wants of the community, or such as may reasonably be expected in the immediate future. The uses considered in fixing value must be so reasonably probable as to have an effect upon the present market value of the land and a speculative value cannot be considered. Olson v. United States, 292 U S. 246, 54 S. Ct. 704, 709, 78 L.Ed. 1236. In order to warrant taking into consideration claimed special adaptability in fixing value, it must appear that the market value has been thereby enhanced. As said by the Supreme Court in Olson v. United States, supra:

" 'Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.' "

The court instructed the jury in accordance with the above principles, and after instructing that the jury could not allow mere speculation and conjecture to become a guide in ascertaining the value of the land, stated:

"She [the landowner] is entitled to receive the fair market value of the property as it stood on the date of the taking, not what she might have been able to realize from the property over a period of years in the event she were able to install or have installed equipment for quarrying and in the event stone could have been sold on the market by the operator of such quarry, unless you find from the testimony that such would have probably happened and would have been considered in fixing the market price.

\*  \*  \*  \*  \*  \*

"* * * but in determining the market value you may consider any enhancement in value, if any, because of the existence of stone and other building materials in commercial quantities on the land at the time of the taking and which would influence and add to the market price, if any, that would be agreed upon between a seller and a prospective purchaser keeping in mind the needs and commercial market, if available, wherever situated existing at the time and created by the needs and wants of the localities that would purchase the stone or by such commercial needs and wants which might reasonably be expected in the near future so far as such market if any, appears from the evidence."

█ It is obvious that the jury's verdict was based upon the property's value for rock quarrying purposes, and implicit in such a conclusion is a finding that the property was suitable for and could reasonably be converted to a rock quarry and there was an existing market for the stone, or such a market was so reasonably probable as to have an effect upon the market value of the land at the date of taking. This brings the court to the real question raised by the motion. That is, whether the jury's verdict is based upon speculation and conjecture rather than substantial evidence, or, if there was substantial evidence to support it, whether it is so against the clear weight of the evidence that the ends of justice require the granting of a new trial.

An examination of the evidence adduced by the landowner reveals that her witnesses based their opinions as to value upon royalties that would be received by her from quarrying operations in the next ten to twenty-five years from a physical plant costing from $250,000.00 to $350,000.00. Similar evidence in other cases has been rejected as too speculative to form the basis for an award of fair market value based thereon. As stated in United States v. 13.40 Acres of

Land in City of Richmond, etc., D.C.N.D. Calif., 56 F.Supp. 535, 538:

"What they really did was to appraise the present value of the anticipated profits from the sale of the rock material and not the market value of the land itself as of the date of the taking. Such a modus of evaluation is not according to proper standards or criteria legally approved in the determination of market value.

"The separate valuation of timber or rock attached to land, or valuations arrived at by a process of multiplying the number of cubic feet or yards by a given price per unit, are not approved bases for evaluation."

And, in United States v. 5 Acres of Land, etc., D.C.E.D.N.Y., 50 F.Supp. 69, 71: "The method pursued by the defendant, in showing, by its expert, of the probable quantity of sand and gravel to be found below the surface, the probable expenses of machinery and operation in the future are too speculative, and the attempt to value the land in such a manner has been condemned by the weight and authority of judicial decisions. (Citing cases.)"

Clearly an award approximating the amount testified to by the landowner's witnesses would have to be rejected as based upon speculation and conjecture and not upon any substantial evidence. That a prospective purchaser would be guided by the chance of someone investing $300,000.00 in equipment and conducting quarrying operations over a period of 15 or 20 years, with all the uncertainties implicit in such an undertaking, is hardly within the realm of possibility, much less probability. However, the verdict was for $60,000.00, rather than $400,000.00 to $600,000.00 as testified by the landowner's witnesses, but the landowner contends that the award in that amount is not based upon speculation and is not only supported by substantial evidence but is not against the weight of the evidence.

If it be assumed for present purposes that, in accordance with the court's instructions, the jury found that the presence of the limestone deposits on the property enhanced its value to the extent that $60,000.00 represented the price a willing buyer would have paid a willing seller on December 8, 1947, nevertheless the court is now convinced, from its study of the record, that such a finding is at least against the clear weight of the evidence. As stated above, the testimony of the landowner's witnesses as to market value is based upon an erroneous and entirely speculative theory, and the testimony of the other witnesses is not sufficient. As to Loyne Hurst's testimony of his and his father's plans, the Supreme Court, in U. S. ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 281, 63 S.Ct. 1047, 1056, 87 L.Ed. 1390, said: "It is a well settled rule that while it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken (citing cases), not all losses suffered by the owner are compensable under the Fifth Amendment. In absence of a statutory mandate (United States v. Miller, supra, 317 U.S. page 376, 63 S.Ct. [276] page 281, 87 L.Ed. 336) the sovereign must pay only for what it takes, not for opportunities which the owner may lose."

And, the testimony of H. L. Dickerson as to an "accelerated market" is entirely too general, especially when compared with the testimony of the plaintiff's witnesses, particularly that of Dr. Bowles.

Therefore, the motion for a new trial should be granted. And, on a new trial the landowner will be expected to present her case in accordance with the principles set forth in this opinion. That is, while testimony as to the quantity and quality of the limestone deposits will be admitted, testimony as to value should be directed to the accepted test—the price the property would have brought in the market on December 8, 1947, between a willing buyer and a willing seller. The evidence must be more specific as to the suitability and availability of the property for a quarry, considering all factors, such as but not necessarily limited to plant expense, operation expense, transportation, and the presence or reasonable probability of a commercial market, not created by the Government's needs, that would have affected the market price of the property on that date.

An order in accordance with the above will be entered.