**UNITED STATES of America,**
**Plaintiff,**

v.

**599.86 ACRES OF LAND, MORE OR LESS, IN JOHNSON AND LOGAN COUNTIES, ARKANSAS, and John L. Zimpel, et al., and Unknown Owners, Defendants.**

**UNITED STATES of America,**
**Plaintiff,**

v.

**118.57 ACRES OF LAND, MORE OR LESS, IN JOHNSON COUNTY, ARKANSAS, and Ruth Blackburn White, et al., and Unknown Owners, Defendants.**

**Nos. 1658, 1687.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

April 23, 1965.

---

\* Specially designated.

564

Charles M. Conway, U. S. Atty., Fort Smith, Ark., Max E. Findley, Special Asst. to U. S. Atty., for plaintiff.

Sexton & Robinson, Fort Smith, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

### Civil No. 1658

Clarence E. Mills and wife, Minnie Mills, were the owners of 133.33 acres of land located approximately three miles southwest of Clarksville, Arkansas, and being in the Southwest Quarter and the Southwest Quarter of the Northeast Quarter of Section 14, Township 9 North, Range 24 West. By declaration of taking filed June 18, 1962, the Government acquired a fee simple estate with the minerals reserved and subordinated to Tract 1911 consisting of 81.14 acres, and a perpetual flowage easement with minerals reserved and subordinated on Tract 1911E–1 containing 7.5 acres, and Tract 1911E–2 containing 3.5 acres, making a total of 81.14 acres acquired in fee simple and a perpetual flowage easement on 11.0 acres, leaving a remainder of 41.19 acres.

### Civil No. 1687

The Ozark Real Estate Company owned, among other lands, a part of the West Half of the Southeast Quarter of Section 16, Township 9 North, Range 23 West, in Johnson County, Arkansas, containing 49 acres. By declaration of taking filed November 9, 1962, the Government acquired the fee simple estate with the minerals reserved and subordinated to Tract 1626 containing 17.69 acres, and a perpetual flowage easement with minerals reserved and subordinated on Tract 1626E containing 3.50 acres, leaving a remainder of 27.81 acres, which includes 4.81 acres, being a 150-foot right of way of the Missouri Pacific Railroad Company across the ownership.

On October 3, 1963, a pretrial conference was held in the County Court House at Clarksville, Arkansas, the landowners being represented by their attorneys and the Government appearing by a Special Assistant to the United States Attorney.

The tracts under consideration in each case were consolidated for trial, and the hearing to determine just compensation was held on October 9, 10, and 11, 1963, the parties being represented as above.

The Commission filed its report on October 21, 1963. On November 1 the landowners filed exceptions to the report of the Commission, and on December 2 filed "Further Objections to the Report of Commissioners." On December 6 the Government filed its response to the landowners' objections and to their "Further Objections." The parties obtained a transcript of the testimony and proceedings before the Commission, and all parties have submitted briefs in support of their contentions as evidenced by the exceptions and further exceptions of the landowners and the response thereto of the Government.

The Commission in its report stated that the landowners contended as to each of the tracts, "that although the minerals are reserved to the landowner by the Declaration of Taking they are subordinated to the Government's right to flood the surface, and as a consequence of the flooding the value of the coal as a mineral has been or will be destroyed. The Government takes issue with this position, and subsidiary issues arise in that it has to be determined by the Commission whether the taking by the Government destroys or damages the mineral estate, and secondly, a determination of the damages in that respect. In this instance, the fee simple title is vested in the respective owners, and there is no problem of apportionment."

In the "Further Objections to the Report of Commissioners" the landowners made three specifications of error: (1) the conclusions of the Commissioners are contrary to the clear weight of evidence, (2) the Commission failed to correctly apply controlling law, and (3) the report of the Commissioners is not sufficient to afford a basis for review.

In the response of the Government to the landowners' "Further Objections," and particularly to objections 1 and 2, the Government in paragraph 1–A set forth 18 alleged facts in answer to contentions 1 and 2 of the landowners. (It would unduly extend the opinion to set forth verbatim all of the reasons so alleged by the Government.) Objections 1 and 2 should be considered together and prior to the consideration by the court of objection 3 to the effect that the report of the Commissioners is not sufficient to afford a basis for review.

While all tracts herein were consolidated for the hearing, the Commission discussed and made separate findings of fact and conclusions of law. Thus it seems that the court in reviewing the report of the Commission should consider, as far as practicable, each case and the tracts contained therein separately, but since the hearings were consolidated, some of the evidence is applicable to all the tracts.

### Tracts 1911, 1911E–1, 1911E–2

These tracts have approximately 80 acres of open and pasture land. The highest and best surface use is for a small livestock operation of the subsistence type. Government Exhibit 3 is a photograph of the surface improvements, none of which were taken. The exhibit contains five photographs: (1) dwelling, (2) small house and storage, (4) barn with open shed; (5) hen house; (7) old dwelling. The improvements are in exceptionally poor condition.

Mr. Mills, the landowner, valued the entire ownership of 133.33 acres at $80,-000 as of the date of the taking, and the remainder at $10,000, or a difference of $70,000.

As to the value of the surface, the witnesses for the Government testified that the value of the entire ownership prior to the taking was $7,500 and after the taking was $2,950, a difference of $4,550. According to O. B. Yaeger, a hydrologist for the Corps of Engineers, the lowest point on the tract would be approximately 335 feet above mean sea level in the bed of a creek that traverses the property; that otherwise, the property would be above the 338 foot level which would be

the normal pool power level of the Dardanelle Lake; that the frequency of flooding at the 349 foot level would occur on an average of once in five years; that it would flood to the 354 foot level, the upper line of the easements taken, on an average of once in 50 years.

T. A. Raley, an appraiser, whose qualifications are not questioned, checked sales of coal interests with either the seller or the buyer. The sales were of lands where the entire fee was sold, including the coal, and where coal alone was the subject of the conveyance; that as to the market value determined from the sales so checked and compared, the minerals have a value of $5.00 to $25.00 per acre. Government Exhibit 4 shows the thickness of the coal on two of these sales so investigated to be 20 inches and on other sales it would appear that the land involved was low or close to the river or formerly islands in the river.

The real question involved in these tracts, as well as the two tracts in Civil 1687, is the enhancement, if any, of the market value by reason of the tracts being underlaid with coal.

The landowner, Mr. Mills, is a miner and has been for several years. His land is underlaid with coal approximately 38 inches thick with a middle band, but no mining of any kind has occurred during the last 40 years.

The Commission had before it the landowners' Exhibit No. 1 showing the coal contours in the vicinity of the tracts included in both cases. The exhibit shows a platting of Big Danger Fault running generally east and west, and refers to other faults in the structure of land in the area.

Mr. B. E. Cobb, basing his testimony upon the testimony of another witness, Mr. Edward F. Woodson, adduced by the landowner, fixed the value of the coal in place in his opinion at $65,250, by multiplying the estimated number of tons by a royalty value of 25 cents per ton.

Mr. Edward F. Woodson, a civil engineer, estimated the amount of coal under the tracts now under consideration to be 397,290 tons; that after the construction of the Dardanelle Reservoir it would not be economically practicable to recover the coal. This witness used an unusual rule in figuring the amount of the coal. He designated it as the "old Scotch rule," which he explained at page 65 of the transcript as being a rule which considers 150 tons per acre per inch regardless of the thickness of the overburden.

Mr. Sterling Hurley is President of the Ozark Realty Company which owns Tracts 1626 and 1626E in Civil No. 1687, and 6,000 or 7,000 acres of other land in Johnson County but none of which is adjacent to the tracts involved herein. The lands now owned by Ozark Realty Company were formerly owned by two Ohio corporations. In 1958 Hurley acquired the controlling interest and subsequently organized the Ozark Realty Company. The capital stock cost him $300,000 to $400,000, or $50 to $60 per acre. The assets of the corporation are primarily the 6,000 or 7,000 acres of land. The income of the corporation is derived from coal royalties, etc.

On Tract 1911 there is an abandoned mine once operated by the Eureka Anthracite Coal Company and abandoned sometime before 1920. Mining operations have been conducted in the general area since the Civil War, and there are literally thousands of acres of coal in the general area. One witness testified that there is approximately 96 million tons of unmined coal. The depth of the coal below the surface of the earth vitally affects the market value of the coal lands, whether it is to be a stripping operation or shaft operation. Most of the mining operations have been north of Big Danger Fault, and the tracts in both cases are situated north of said fault.

The Harding Coal Company mine (Cat) is situated 1½ miles east of the 1911 series, and it is through this shaft that most of the mines in the area have been flooded. All of the mines in the area have been flooded, and the water level in the mines is standing at approximately 338 feet above sea level except when strip miner, the witness B. E. Cobb, is

operating a strip operation east of the tracts. It is necessary that he lower the water level in the abandoned mines in order to conduct his stripping operations located approximately 1½ miles from the 1911 tracts, which makes the operation rather expensive.

The production from the Spradra area had been declining during the last past five years. Five years ago there was a production of approximately 250,000 tons, but now the production is at most 100,000 tons, but more likely less than 75,000 tons per year. The chief market for the coal is zinc smelters in Arkansas, Oklahoma, Texas and Missouri.

A visual glance at the maps and a reading of the testimony, particularly of the witness Robert Keith, who discussed the 25 or 30 abandoned mines, is convincing that the coal underlying the lands does not enhance to any marked degree the market value of the lands.

Mr. Keith worked as a miner for 51 years, and from personal information described a great many mines in the general area of these tracts. (TR 162–173.) He related a story about a rope breaking in one of the mines and coming out at another mine. The workings in the abandoned mines are so connected that a person may lose his way and wander around for days. During most of the time that these mines were in operation, the law required that a miner should not mine within 25 feet of the boundary line, but the miners did not observe that law and all violated the law "and the other fellow had to pump his water for nothing." (TR 169.) All of the old abandoned mines are filled with water, and in operating a mine in the vicinity of the 1911 series of tracts, as well as the 1626 series, you would be required to pump water all of the time and that is very expensive. (TR 71.)

All of the coal in the SE½ of the SW ½ of Section 14 has been mined. A part of the coal in the NE½ of the SW½ has been removed. None of the coal in the SW½ of the NE½ has been removed, nor has coal in any substantial part of the land lying in the NW½ of the SW½ been removed. None of the coal in the 1911 series of tracts is subject to removal by stripping operations.

### Tracts 1626, 1626E

There have been no coal operations on these tracts. Some of the coal on the tracts might be removed by a stripping operation, but there is no testimony to show the amount that might be so removed. As for the surface of these tracts there is about 1½ acres of bottom cropland now open with possibly another 8 acres that could be developed but which is now grown up with the usual kinds of timber that are found along rivers such as the Arkansas. The remainder of the surface is upland woods and there are no improvements on the ownership. The highest and best use of the entire ownership is for timber and limited grazing. There is underlying the tracts coal approximately 42 inches thick. The witness Woodson estimated the value of the coal underlying these two tracts to be $53,000. In making his estimate he used the "old Scotch rule," and estimated that there was a total of 318,150 tons under the entire ownership with 111,447 tons being under Tract 1626, taken in fee, and 22,057 tons under Tract 1626E, upon which an easement has been imposed.

The witness Sterling Hurley, heretofore referred to, stated that in his opinion the fair market value of these tracts before the taking was $60,000 and the value of the remainder after the taking was $3,000, a difference of $57,000.

One of the Government's witnesses, Henry K. Field, fixed the value before taking at $1,600 and the value after taking at $850, a difference of $750 for the surface only. One of the witnesses, Mr. Cobb, testified that he had bought coal lands in the area about five years ago, but he was not asked either by the Government or by the landowner as to how much he paid for the coal lands, or whether he determined the market value or price paid by him by estimating the

number of tons of coal and multiplying 25 cents by the number of tons.

The owner, Ozark Realty Corporation, has not acquired any additional coal lands since its organization or since Mr. Hurley bought the capital stock of the two former organizations that owned the area. All of the land presently owned by the Ozark Realty Company has been owned either by it, or its predecessor corporations, since 1907, and notwithstanding the present landowner has owned the tracts since 1958, there has never been any mining operations thereon.

■ In reference to contention 2 of the landowners that "the Commission failed to correctly apply controlling law." The landowners are entitled to the market value of the estate taken. They did not adduce any evidence to establish the market value of the estate taken, but contend that each ton of coal in place is worth 25 cents and that 25 cents multiplied by the estimated number of tons is just compensation.

No contention was made by the landowners relative to the value of the surface estate, and because of the condition of the surface it is not difficult to understand why the landowners made no serious contention relative to the value of the surface.

Judge Mehaffy, in discussing "just compensation" in the case of United States v. Crance (8 Cir. 1965), 341 F.2d 161, beginning at the bottom of page 165 said:

"The Fifth Amendment does not contain any standard of fairness for determining 'just compensation.' United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949). The so-called working rules of judicial expressions are nothing more than efforts by the judiciary for arriving at equitable awards under varying circumstances. The Supreme Court stated in Bauman v. Ross, 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897), 'Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual * * *.' In the later case of United States v. Commodities Trading Corp., 339 U.S. 121, 124, 70 S.Ct. 547, 94 L.Ed. 707 (1950), cited with approval in United States v. Virginia Electric & Power Co., 365 U.S. 624, 631, 81 S.Ct. 784, 789, 5 L.Ed.2d 838 (1961), the Supreme Court stated, 'The word "just" in the Fifth Amendment evokes ideas of "fairness" and "equity" * * *.'"

In United States v. Miller (1943), 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, the court, beginning at page 373 of 317 U.S., at page 279 of 63 S.Ct. said:

"The Fifth Amendment of the Constitution provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.

"It is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose. In an effort, however, to find some practical standard, the courts early adopted, and have retained, the concept of market value. The owner has been said to be entitled to the 'value', the 'market value', and the 'fair market value' of what is taken. The term 'fair' hardly adds anything to the phrase 'market value', which denotes that 'it fairly may be believed that a purchaser in fair market conditions would have given', or, more concisely, 'market value fairly determined'.

" * * * Where, for any reason, property has no market, resort must be had to other data to ascertain its value; and, even in the ordinary case, assessment of market value involves the use of assumptions, which

make it unlikely that the appraisal will reflect true value with nicety. It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or insignificant amounts, the application of this concept involves, at best, a guess by informed persons."

The case of United States v. 620.00 Acres of Land, etc. (W.D.Ark.1952), 101 F.Supp. 686, involved a tract of land containing 40.0 acres, which was condemned by the Government for use in connection with the Bull Shoals Dam and Reservoir Project. The Government obtained from this tract a large portion of the stone that was used in making the concrete that went into the dam. The question of just compensation for the tract was tried to a jury. The landowners' testimony ranged from $400,000 to $600,000, whereas the Government's testimony was $800. The difference in the contentions of the landowners and the Government was accounted for by the fact that the landowners' witnesses valued the tract on the basis of the limestone deposited thereon, while the Government's witnesses did not consider the presence of such deposit as enhancing the market value of the land. The jury returned a verdict for $60,000. The Government filed a motion for new trial, and in the consideration of the motion the court, beginning at page 689, said:

"Evidence as to the quantity and quality of limestone deposits was relevant and material, and, therefore, to be considered by the jury, only in so far as it affected the fair market value of the property on the date of taking. That is, how it affected the price that a willing buyer would pay in cash or its equivalent to a willing seller. Such a result would necessarily depend upon whether the property was reasonably suitable as a quarry site and whether there was an existing market for the stone, or if not, whether such a market was so

reasonably probable as to have an effect upon the market value of the land at that time. As stated in United States v. Foster, 8 Cir., 131 F.2d 3, 5: 'In determining the value of land taken by eminent domain, the jury may consider all uses to which it is adapted and might be put, and may award compensation upon the basis of its most advantageous and valuable use. To warrant the admission of testimony as to value for purposes other than that for which it is actually used, however, regard must be had for the existing conditions and wants of the community, or such as may reasonably be expected in the immediate future. The uses considered in fixing value must be so reasonably probable as to have an effect upon the present market value of the land and a speculative value cannot be considered. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 709, 78 L.Ed. 1236. In order to warrant taking into consideration claimed special adaptability in fixing value, it must appear that the market value has been thereby enhanced. As said by the Supreme Court in Olson v. United States, supra:

"'Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.'"

On page 691 this court said:

"* * * And, on a new trial the landowner will be expected to present her case in accordance with the principles set forth in this opinion. That is, while testimony as to the quantity and quality of the limestone deposits will be admitted, testimony as

to value should be directed to the accepted test—the price the property would have brought in the market on December 8, 1947, between a willing buyer and a willing seller. The evidence must be more specific as to the suitability and availability of the property for a quarry, considering all factors, such as but not necessarily limited to plant expense, operation expense, transportation, and the presence or reasonable probability of a commercial market, not created by the Government's needs, that would have affected the market price of the property on that date."

See, also, United States v. 26.81 Acres of Land, More or Less, in Benton County, Ark., etc. (W.D.Ark.1964), 226 F. Supp. 829.

In the case of United States v. 116.00 Acres of Land, More or Less, in Benton County, Ark., etc. (W.D.Ark.1964), 227 F.Supp. 100, the United States obtained by condemnation Tract No. 1323 containing approximately 25 acres. There were objections to the report of the Commission, and in disposing of the objections the court, beginning at page 105, said:

"All of the witnesses, including the landowner, Mr. Wiseley, in testifying as to the value of Tract 1323, arrived at their opinions of value either directly or indirectly by multiplying the estimated number of tons in place by some fixed amount per ton, either profit or royalty. The landowner was entitled to show the adaptability of his land for use in a particular business, that is, the sand and gravel business, which was found by the Commission to be the highest and best use of the tract. In addition, they were permitted to present evidence as to the quality, quantity, market conditions, feasibility of removal, and the replenishment potential, but it does not follow that the landowner was entitled to have the value of the tract based upon either speculative past or future profits. See, United States v. 620.00 Acres of Land, etc., (W.D.Ark.1952) 101

F.Supp. 686; United States v. 765.56 Acres of Land, etc., in the Town of Southampton, (E.D.N.Y.1959) 174 F. Supp. 1.

"In Georgia Kaolin Co. v. United States, 214 F.2d 284, at page 286 (5 Cir. 1954), the court said:

" 'In eminent domain proceedings, the existence of valuable mineral deposits in the condemned land constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land. The reason for this rule is said to be that the measure of compensation in such cases is the market value of the land to be condemned, taken as a whole and with due consideration of all the components that tend to make its market value. This rule has been applied to limestone deposits, gold ore, fire clay, coal, stone, and sand and gravel, 156 A.L.R. 1416–1417; but there can be no recovery for both the value of the land and its mineral deposits as two separate items. Atlanta Terra Cotta Co. v. Georgia Ry. & Electric Co., 132 Ga. 537, 64 S.E. 563; United States v. 620.00 Acres of Land, etc., D.C., 101 F.Supp. 686; Orgel on Valuation, under Eminent Domain, page 544, rejecting the method of estimating the amount of stone in situ and multiplying this amount by a fixed price per unit; also citing Searle v. Lackawanna and Bloomsburg Railroad Company, 33 Pa. 57. In rejecting the method of multiplying the estimated amount of clay by a fixed price per unit, the conclusion is largely based on its speculativeness. In discussing this point, the court below said that whether or not the deposits would be mined and the royalties paid would depend upon the condition of the market, the uncertainty of the future, the demand for the product, "and many other elements, on and on, in the future." ' "

In subparagraphs (7), (8), (9) and (10) of numbered paragraph 9 of the

Commission's report, the Commission in the consideration of the 1911 series of tracts said:

"The most difficult question as to Tract No. 1911 is the amount, if any, the existence of the coal tends to enhance the fair market value of the entire ownership as of the date of taking. The circumstances prior to the date of taking are not indicative of any great value to be attached to the coal for mining purposes. Mr. Mills has owned the property for almost twenty years and is a miner, but apparently has not sought to develop this deposit. It would not be feasible prior to the date of taking on account of the water in all the mines in this area to re-open the works abandoned forty years ago. There are now no new mines being opened in the area. The Commission is of the opinion that the existence of this coal bed under Tract No. 1911 would be considered by any prospective purchaser of the entire ownership as a bonus factor, on the remote possibilities of the coal becoming valuable at a future date. The creation of the Dardanelle lake practically removes even this bonus factor.

"(8) The Commission finds that the fair market value of the entire ownership from which Tract No. 1911 was taken is $8500.

"(9) That the fair market value of the remainder after the taking of 81.14 acres, reserving to the landowner the minerals, but subordinating them to the right of the Government to flood, and the imposition of eleven acres of easement, is $2950.

"(10) That just compensation for the taking of Tract No. 1911 and the imposition of the easements is the sum of $5,550."

The only testimony as to comparable sales was given by witnesses for the Government, and the prices paid for lands underlaid with coal ranged from $5 to $25 an acre. The Government obtained in Tract 1911 the fee to 81.14 acres and imposed easements on the other two tracts containing 11 acres. Thus the landowner was left with a remainder of 41.19 acres. Just compensation, including severance damages, was fixed at $5,550, or slightly more than $60 per acre for the land acquired in fee and by easement.

In the 1626 series, the Government acquired the fee simple title to 17.69 acres and imposed a perpetual flowage easement on 3.50 or a total of 21.19 acres and left to the landowner 27.81 acres through which the right of way, 150 feet in width, of the Missouri Pacific Railroad extends. Just compensation was fixed at $1,850, including severance damage, or slightly more than $87 per acre for the land actually taken.

In subparagraph (4) of paragraph numbered 10 of the Report of the Commission, in determining just compensation for the 1626 series, the Commission said:

"That the coal reserved to the landowner in this instance could be mined and removed by operations from the remainder of this ownership, except the stripping coal. Mr. Cobb testified that he is stripping at a depth of about 60 feet. Obviously, the more overburden that exists on top of a coal vein the more expensive it will be to reach the coal, which illustrates the fallacy of using a fixed sum per ton on the estimated coal in place as a basis for determining the extent to which the coal enhances the fair market value of the lands. To assume the existence of a willing buyer does not warrant any assumption that he will buy on any fixed basis per ton of estimated reserves, or any other formula basis. The landowner in this instance is the Ozark Realty Company, and its manner of acquisition of the title is set out above. Since all of the lands acquired by the Ozark Realty Company were originally held by coal companies, it may be inferred that they were held for possible coal pro-

duction, but the evidence does not disclose whether the coal on this particular tract is comparable to the coal on other acreage of the owner. It is a fact that there has been no development even for strip operations on this tract since the ownership came into the control of Mr. Hurley. It may be that the smallness of the tract was the determining factor in this regard rather than the depth and nature of the coal, particularly since the Ozark Realty Company did not own any lands immediately adjacent to the coal that could be stripped. The predecessor corporations owned this tract for fifty years before it was acquired by the present corporation through merger, and no development was done on this tract. Here again the problem is the extent to which the existence of the coal bed enhanced the value of the entire ownership. As to surface, the land consists of 1½ acres of open crop lands along the river bank, eight acres of cottonwoods which could be restored to crop production, and the remainder in upland woods suitable for timber growing and for very limited pasturage."

After an examination of the transcript of the evidence, the court is convinced that the evidence adduced by the landowners as to the amount of just compensation is purely speculative and conjectural. The evidence is not based upon the realities of the situation.

The landowner Mills at the time of the hearing was working in the coal mines at Sunnyside, Utah. He acquired the tracts in 1944 and had been holding the property as a place "to come back to." He testified that he considered the fair market value of the tracts prior to the taking to be $80,000 and that after the taking the remainder would have a value of only $10,000.

Mr. Hurley, the President of the Ozark Realty Company, testified as to the 1626 series as to the value of the surface, minerals, "the whole shooting match," as follows: "From the informa-tion I have here regarding the coal, the surface and all, I would say $60,000" and that the remainder would be worth $3,000, making a total of $57,000.

■ The law permits, and rightfully so, that in eminent domain proceedings the existence of valuable mineral deposits which constitute an element of value should be taken into consideration if and insofar as the mineral deposit influences the market value of the land. In the instant case the landowners apparently disregarded entirely the fact that the Commission could only award as just compensation the market value of the land at the time of the taking. This rule has been applied in many decisions to coal, stone, limestone, and other minerals. The method followed by the landowners in this case, in estimating the amount of coal in situ and multiplying that amount by a fixed price per unit, is not authorized by law.

■ There was no evidence that the deposits of coal situated as they were and which had been known to exist for more than a century contributed any substantial amount to the market value of the land. On the other hand, the testimony discloses that the market for coal of that type is very uncertain and there is very little demand for it. These tracts contain semi-anthracite coal, which is a substance of high carbon content and low volatility. This limits the market and, as shown by the evidence, the chief market for the coal during the last several years has been zinc smelters. All of these tracts lie north of the Big Danger Fault, and the coal deposits are much more shallow on that side of the fault than on the south side. In other words, that is the area that has been mined during the last century, and the condition of the old abandoned mines tell the story of the value of coal in this area. It cannot be said that the award of the Commission is not supported by substantial evidence.

■ It is the duty of the court to accept the findings of the Commission unless the findings are clearly erroneous.

United States v. 992.61 Acres of Land, More or Less, in Johnson and Logan Counties, Ark. (W.D.Ark.1962), 201 F. Supp. 578. In the opinion of the court they are not erroneous but fully supported by the evidence.

The court does not have the right to reconsider, weigh and evaluate evidence to arrive at its own independent conclusion but must accept those of the Commission unless clearly erroneous.

This brings the court to the consideration of contention No. 3 that "the report of the Commissioners is not sufficient to afford a basis for review."

In this connection the landowners on their brief contend (1) the Commission used its own expertise instead of deciding the case on the basis of the testimony; (2) the Commission did not make such findings and subsidiary findings of fact as to reveal that the ultimate findings of values are soundly and legally based; and (3) the Commission did not express what standards they tried to follow.

The Government contends that the report discloses that the Commission gave full consideration to the respective contentions of the parties. It made numerous findings of specific facts to such an extent that "the path followed by the Commissioners in reaching the amount of the award * * * can be distinctly marked, * * * ", and that the nature and degree of the exactness of the findings required depends on the circumstances of each case.

Many decisions have considered the nature and extent of the findings and conclusions that should be made by a Commission operating under Rule 71A(h), Fed.R.Civ.P. The Supreme Court in United States v. Merz, (1964) 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629, at page 198 of 376 U.S. enunciated the general rule to be followed by a Commission, beginning at page 198 of 376 U.S., at page 643 of 84 S.Ct.:

" * * * Since by Rule 71A(h) the report has the effect of a master's findings of fact under Rule 53(e) (2), the commission should be instructed as to what kind of findings should be included. Conclusory findings are alone not sufficient, for the commission's findings shall be accepted by the court 'unless clearly erroneous'; and conclusory findings as made in these cases are normally not reviewable by that standard, even when the District Court reads the record, for it will have no way of knowing what path the commissioners took through the maze of conflicting evidence. See United States v. Lewis, 9 Cir., 308 F.2d 453, 458. The commissioners need not make detailed findings such as judges do who try a case without a jury. Commissioners, we assume, will normally be laymen, inexperienced in the law. But laymen can be instructed to reveal the reasoning they use in deciding on a particular award, what standard they try to follow, which line of testimony they adopt, what measure of severance damages they use, and so on. We do not say that every contested issue raised on the record before the commission must be resolved by a separate finding of fact. We do not say that there must be an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based. The path followed by the commissioners in reaching the amount of the award can, however, be distinctly marked. Such a requirement is within the competence of laymen; and laymen, like judges, will give more careful consideration to the problem if they are required to state not only the end result of their inquiry, but the process by which they reached it."

There are no objections by anyone relative to the instructions given the Commissioners by the court, and no further reference will be made to the instructions that were given to the Commission as a guide in determining just compensation.

The court is of the opinion that when the nature of the questions before the Commission and the character of the testimony adduced by the landowners as well as by the Government are considered, that the report is sufficient and clearly delineates for the benefit of a reviewing court the reasoning and bases upon which the awards were made.

After a full consideration of all the contentions of the parties, the court is convinced that the report of the Commission should be approved and confirmed.

An order is being entered today fixing just compensation at $5,550.00 for the taking of Tracts 1911, 1911E–1 and 1911E–2, including severance damages, and at $1,850.00 for Tracts 1626 and 1626E, including severance damage.