Willa **HEMBREE**, Helen Garrett and Alberta Chancellor, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 17848.

United States Court of Appeals
Eighth Circuit.

June 23, 1965.

J. A. Appelquist, Springfield, Mo., made argument for appellants and filed brief with Joe W. Collins, Stockton, Mo.

Robert M. Perry, Atty., Dept. of Justice, Washington, D. C., made argument for appellee and filed brief with J. Edward Williams, Acting Asst. Atty. Gen., Washington, D. C., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., F. Russell Millin, U. S. Atty., Kansas City, Mo., and David M. Proctor, Jr., Asst. U. S. Atty., Kansas City, Mo.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

MATTHES, Circuit Judge.

This proceeding was instituted by the United States on June 27, 1963, to condemn the fee simple title to certain land in Cedar County, Missouri, for use in connection with the construction of the Stockton Dam and Reservoir Project on the Sac River. Two of the tracts taken are involved here. Tract 109, consisting of 20 acres, a part of a larger tract, was owned by Willa Hembree. Tract 112, consisting of 40 acres, all of which was taken, was owned by appellants Helen Garrett and Alberta Chancellor. The appeal was taken from the final judgment filed August 20, 1964, awarding appellant Hembree $600 ($30 per acre) as just compensation for Tract 109, and awarding Garrett and Chancellor $1,200 ($30 per acre) for Tract 112.

At issue is the question whether appellants "made a prima facie case" in support of their claims of highest and best use. The Government's position from the outset has been that the highest and best use of the two tracts was limited to grazing purposes, whereas appellants asserted and claimed that the highest and best use was either that of quarrying for limestone or for residential development.

After appellants filed their answers, in which they requested a jury trial of the issue of damages and just compensation, there were several pre-trial conferences. The court by pre-trial order filed June 5, 1964, directed that a hearing be held for the purpose of determining whether there was a factual foundation requiring the submission of evidence to a jury as to the fair market value of the subject tracts for "quarrying purposes or for residential development."

Pursuant to and in accordance with that order the court, on June 30 and July 1, 1964, held a hearing, heard the testimony of a number of witnesses, and admitted and considered numerous exhibits. At the conclusion of appellants' evidence, they having assumed the laboring oar, the Government moved the court to find that "such evidence was insufficient to warrant the submission thereof to a jury, on the issue of just compensation." The motion was granted. Thereafter, at the suggestion of the court, appellants and the Government stipulated for the entry of a judgment for $600 and $1,200 as just compensation for Tracts 109 and 112, respectively, on the basis that the highest and best use of the tracts was for grazing purposes, without prejudice, however, to the right of appellants to appeal from the judgment entered pursuant to the stipulation.

Because of the nature of the issue presented, we deem it essential to review in some detail the evidence which the court ruled was inadequate to provide a sufficient factual foundation for submission to the jury. Before attending thereto we take note of the legal principles that have controlling effect in condemnation proceedings.

We begin with the Fifth Amendment to the Constitution of the United States, which provides that private property shall not be taken for public use without just compensation. "Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 279, 87 L.Ed 336 (1943). See also Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); Mississippi & Rum River Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206 (1878); Clark v. United States, 155 F.2d 157, 160 (8 Cir. 1946). Elaborating further on the rule, Olson,

supra, states at pp. 255–256, 54 S.Ct. pp. 708–709:

"Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. (Citing authorities). * * * But the value to be ascertained does not include, and the owner is not entitled to compensation for any element resulting subsequently to or because of the taking. Considerations that may not reasonably be held to affect market value are excluded.

" * * * The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth."

In accord: McCandless v. United States, 298 U.S. 342, 56 S.Ct. 764, 80 L.Ed. 1205 (1936); United States v. Foster, 131 F.2d 3, 5 (8 Cir. 1942), cert. denied 318 U.S. 767, 63 S.Ct. 760, 87 L.Ed. 1138 (1943); Cade v. United States, 213 F.2d 138 (4 Cir. 1954).

The enhanced value created by the condemnor's need for and use of the property is not to be considered in determining the fair market value of the property that has been taken. United States v. Cors, 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); United States v. Miller, supra; United States v. Rayno, 136 F.2d 376, 378, 379 (1 Cir. 1943), cert. denied 320 U.S. 776, 64 S.Ct. 90, 88 L.Ed. 466 (1943); United States v. Crance, 341 F.2d 161 (8 Cir. 1965).

In addition to showing physical adaptability to a different use for the purpose of ascertaining fair market value, a landowner must show that a market existed on the date of taking or is reasonably likely to exist in the near future and mere physical adaptability is insufficient to discharge the burden of proving the existence of a market. Olson, supra; United States ex rel. and for Use of Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); Cameron Development Co. v. United States, 145 F.2d 209 (5 Cir. 1944).

We now revert to the evidence.

*Limestone Issue.*

The subject tracts are contiguous, and are located approximately one mile west of the city limits of Stockton, Missouri. In a "Stipulation for Pre-Trial Order" the parties agreed that a deposit or stratum of limestone of the compton variety is located within and beneath both tracts. In answer to interrogatories propounded by appellants, the Government stated that borings had been made on both tracts; that a stratum of limestone 8 feet thick known as "Zone B" of the compton formation lies at a depth of approximately 832 to 840 feet m.s. 1. within Tract 109; that an 8-foot stratum of limestone of the compton formation underlies Tract 112 at an elevation of approximately 860 feet m.s. 1. A laboratory analysis established that Tract 109 limestone contains 41.19% calcium carbonate, a plant food, and 39.08% magnesium carbonate, which is a sweetening agent to the soil; that Tract 112 limestone contains 47.30% to 55.33%

calcium carbonate and 26.05% to 39.38% magnesium carbonate. From September, 1953 to the latter part of 1957 the quarry was operated on Tract 109 by one Preston under a lease from the owners. Appellants' proof of a market for the limestone in question is found largely in the testimony of two expert witnesses and in the testimony of Mr. Preston. The qualifications of the expert witnesses were not questioned and need not be detailed here. Mr. Hopper is the production and sales manager of the McQuerter Chemical Company located at Mt. Vernon, Missouri. Based upon an inspection of the analysis made of samples taken from both tracts and upon his knowledge of the use of and demand for the quality of limestone under consideration, this witness stated that there is a "market today" and a "growing market" for such limestone. The other expert witness, the co-owner and operator of a limestone quarry located reasonably near Tracts 109 and 112, made an inspection of the limestone quarry located on Tract 109 and testified unequivocally that there is a market existing for dolomite limestone.[1] From the testimony of appellants' witnesses it was developed that the limestone is adapted principally for agricultural purposes but it is also suitable and desirable for use as a filler in making fertilizer.

It is clear that the court was convinced that there was and is a "general market" for the subject dolomite limestone.[2] Indeed, we are satisfied that it would be difficult to reach a contrary conclusion from this record. What obviously troubled the court was whether it would be economically feasible to quarry, process and market the limestone. Several factors were emphasized and undoubtedly influenced the court in its decision, namely, the overburden which varied in depth from an outcropping of the stratum in certain areas to a maximum thickness of approximately 60 feet; the discontinuance of price support to farmers by the ASC (Agricultural Soil & Conservation Service); the competitive market; the fact that the deposit was only 8 feet thick and that there was a layer of the compton variety of limestone separated by a shale rock from a layer of the cotter variety, thus making the quarrying operations more difficult.[3] Additionally, the discontinuance of the quarrying operations by Preston in 1957 had a decided impact on the court's thinking.

We have studiously examined and analyzed all of the evidence and are unable to escape the conclusion that there was a sufficient showing made to require submission of the limestone issue to the jury.

The undisputed, indeed conceded, fact is that for a number of years, ending in the latter part of 1957, a quarry was operated on Tract 109 and limestone was extracted, processed and sold. The records of Preston, the quarry operater, established that royalties were paid to the landowners as follows: 1953, $130.32; 1954, $138.96; 1955, $275.66; 1956, $207.80; 1957, $73.44. During those years the operator derived an operating profit of $12,728.12, which did not reflect any reserve for depreciation or taxes. Although there is room to infer that the discontinuance of the Government subsidy to farmers under the ASC program was a factor motivating the discontinuance of the quarrying operation, we are not persuaded that the evidence is conclusive in that respect. Preston testified that for health reasons he ceased the operation. Moreover, there was unequivocal testimony that the discontinuance

---

1. The subject limestone was frequently referred to by the court, counsel and witnesses as "dolomite" variety. Dolomite is defined as a limestone rich in magnesium carbonate. See Webster's New International Dictionary, unabridged (3rd Ed. 1965).

2. During the course of interrogation of Mr. Hopper the court stated: "You have testified very convincingly to me that there is such a [general] market."

3. The record indicates that "compton" is the variety of limestone, slightly dolomitic, composed largely of calcium carbonate, whereas "cotter" is dolomite limestone which, as shown in footnote 1, supra, contains a high quantity of magnesium carbonate.

of the Government aid to farmers did not remove dolomite limestone from the market and that during the time the program was in effect there were farmer-purchasers who did not take advantage of the benefits.

We are not persuaded, as the trial court apparently was, that Olson v. United States, supra, and Foster v. United States, supra, require the holding that there was no evidence from which a jury could permissibly find for appellants on this issue. Certainly we subscribe to the teachings of Olson and Foster but because of the distinguishing factual features we do not agree that they control this case.

In Foster, the question was whether the condemned land had an added value for industrial purposes. Witnesses for the landowner admitted that the enhanced value was based upon the fact that the ordnance plant for which the land was condemned had been located in that area. This court, in reversing, ruled that the evidence should have been stricken, stating at 131 F.2d p. 6:

> "The prospective value of the property was purely speculative. So far as appears from the tesimony, the only industrial use ever contemplated for this property was that for which the defendant was appropriating it."

Here, appellants have never claimed that the value of stratum of limestone, or the market therefor, were enhanced because of the Government's need for the property. Cameron Development Co. v. United States, supra, also relied upon to sustain

the district court's ruling, is more in point but not necessarily dispositive.

We believe Cade v. United States, supra, involving a deposit of granite rock; United States v. Rayno, supra, involving hardpan; and National Brick Company v. United States, 76 U.S.App.D.C. 329, 131 F.2d 30 (1942) involving sand deposit, are more apposite. See also McCandless v. United States, supra; Clark v. United States, supra.

█ Further extended discussion is unnecessary. Certainly the court is to be commended for its effort to narrow and simplify the issues and thereby facilitate resolution of the basic question—the fair market value of the land. However, it is compellingly clear that what was initiated as and intended to be an inquiry into the competency and relevancy of evidence, was escalated into a full-scale trial of the basic question. The record on appeal consists of 44 exhibits and a transcript of approximately 350 pages containing the testimony of 5 witnesses. With the hearing assuming this posture, it is perhaps understandable why the stated purpose of the hearing was submerged. We are convinced from a fair and realistic appraisal of what actually transpired that the court's decision was dictated by its evaluation of the weight of the evidence which turned in part at least on credibility. The court, in the role of the fact-finder, concluded that there was no evidentiary basis for the claim that the value of the condemned land was enhanced because of the limestone deposit.[4] Perhaps a jury

---

4. In announcing its decision from the bench, the court stated in part:

> "So far as any enhancement of value by reason of the evidence of the strata of dolomite which had been actually quarried from the years 1953 through 1957, by Mr. John Preston * * * I cannot help but think that had the quarrying of the limestone on that particular property been commercially feasible, after the withdrawal of the ASC support, that Mr. Preston, if his health permitted—and if his health did not permit, he certainly could have employed someone to keep him from any asthma attacks * * * would have in fact used the equipment that

was on site and available for use at that time.

> \* \* \* \* \*

> "I think there is very little dispute in the evidence that dolomite does have a commercial use, *but again when all of the facts and circumstances are taken into consideration, the question resolves itself as to whether a prudent buyer would in fact pay more money for the subject tracts in order to quarry dolomite or whether he wouldn't,* and I am convinced that the market for dolomite as such and the competitive situation that dolomite finds itself in * * * would necessarily mean that one who would

would reach the same conclusion but that was not for the trial court to determine and is not, of course, an issue before us. We are constrained to hold that the evidence provided a sufficient factual background to require submission of the limestone issue to the jury. The cause must, therefore, be remanded for trial of that issue.

### Residential Development Issue.

 The court also held that the evidence offered by appellants relating to the enhanced value of the land for residential development was also insufficient as a matter of law and that it would not submit this issue to a jury. We are in agreement. Although appellants' expert witnesses testified that the land was suitable for development of small residential sites or lots, they conceded under cross-examination that the added value for this purpose was created by the construction of the Stockton Dam and Reservoir. Such evidence would not be admissible. United States v. Miller, supra; United States v. Cors, supra; United States v. Foster, supra. We affirm the court's ruling on this issue.

▪ There is also the suggestion in appellants' brief that the award of $30 per acre for grazing and pasture purposes is inadequate and should be set aside. We have difficulty in reconciling such contention with appellants' agreement embodied in the post-trial stipulation hereinabove referred to. In that stipulation, which was executed by the attorneys for appellants Willa Hembree and Helen Garrett, and by appellant Alberta Chancellor pro se, they expressly agreed that the "fair market value of Tract No. 109 for grazing purposes was in the sum of $600.00 on June 27, 1963" and that the "fair market value of Tract No. 112 for grazing purposes was in the sum of $1200.00." Appellants were at liberty to

enter into an agreement establishing the value of the land for grazing purposes or refrain from doing so. Having elected to settle the matter, they are bound by their agreement. Mahowald v. United States, 176 F.2d 509 (8 Cir. 1949). Accordingly, this phase of the litigation having been conclusively determined, should not again be litigated.

Reversed and remanded for further proceedings consistent with our views as expressed herein.

---

be interested in purchasing property for getting into the quarry business would in fact purchase a quarry that would have a stone that had a market that would be able to survive in the competitive situation that quarrying operations

in the Ozarks finds themselves." (Emphasis supplied).

It seems almost too plain for argument that the quoted remarks demonstrate rather clearly that the court was resolving the very question that should have been submitted to a jury.