STATE, BY DOUGLAS M. HEAD, ATTORNEY GENERAL, v.
CLAYTON ANDERSON AND OTHERS.

197 N. W. 2d 237.

April 28, 1972—No. 42933.

**456**

*Fisher, Johnson, Evans & Buttrick, Fred W. Fisher, Wayne C. Serkland,* and *A. M. Bullis,* for appellants.

*Warren Spannaus,* Attorney General, *Eric B. Schultz,* Deputy Attorney General, and *John C. Jeppesen* and *Gary H. Peterson,* Special Assistant Attorneys General, for respondent.

Heard before Knutson, C. J., and Murphy, Kelly, and Hachey, JJ.

PER CURIAM.

Appeal from a judgment of the district court awarding damages in condemnation proceedings instituted by the State of Minnesota for highway purposes. Appellant property owners contend that the proceedings to condemn their property were instituted subsequent to a prior condemnation connected with the same general highway construction project; that they were separate and independent proceedings; and that the court erred in denying an increase in the value of their property resulting from the original condemnation action.

The facts upon which the trial court based its findings and conclusions of law were stipulated. The action grows out of the construction of a portion of Interstate Highway No. I-35. In the original condemnation proceedings, the state acquired the right-of-way and took access rights and certain adjacent property located along the western limits of the village of North Branch, in which the property in question is located. In the particular area involved, Highway No. I-35, which runs generally north and south, intersects Trunk Highway No. 95, which extends in a general east and west direction through the village. The project required construction of an interchange between these two highways.

The original plan for the construction of the portion of Highway No. I-35 was modified at the request of the village so as to establish the centerline approximately 500 feet from the village limits. The Minnesota Highway Department accordingly condemned land sufficient to construct the highway immediately adjacent to the village, with all necessary frontage roads, exits, and entrances. As a result of this modified plan, 14th Avenue, which extends along the west corporate limits

of the village, was closed off. This closing was protested by the village and, in order to compensate for the loss of the use of this avenue, the state agreed to extend Oakview Avenue, which runs parallel and one block east of 14th Avenue, to permit north and south travel over Highway No. 95. In the construction of the extension of Oakview Avenue, it was necessary to acquire the property in question, which represents part of the northeast and southwest quadrants adjacent to the intersection of Highway No. I-35 and Highway No. 95. It is contended that the taking of property for the extension of Oakview Avenue involved a second and independent condemnation proceeding which was not within the scope of the original action and that, in awarding damages, the measure therefor should have allowed for an increase in value resulting from the first taking.

The chronology of events leading to the condemnation of appellants' property is of importance in considering the merits of their claim. The extended negotiations between the highway department and the village of North Branch must be considered in light of the statutory requirements then in effect, Minn. St. 161.17, subd. 2. Section 161.17, subd. 2, declares that, in the construction of the interstate highway system, municipalities through which routes pass "should have an important role in the development of [the] highway system;" and that there should be "close cooperation" between the highway department and local governing bodies to secure "orderly review of plans and the resolution of differences over interstate routes and projects."

From the sequence of events in connection with the construction of Highway No. I-35 near the village of North Branch, it appears that, on May 5, 1965, the village first communicated with the highway department to protest the closing of 14th Avenue. At a meeting with the highway department in June 1965, testimony was taken protesting the closing of the avenue. The hearing on the petition for the first condemnation was had on September 16, 1965. On November 15, 1965, the village, by resolution, protested the closing and suggested that changes be made around the interchange of Highway No. I-35 and Highway No. 95. In December 1965, further testimony was taken at a meeting with the highway department concerning the protest by the village. On December 7, 1965, the commissioners made their award in the original proceedings. On March 14, 1966, the village passed a resolution refusing to approve the highway department plans. After further negotiations, the highway department, on August 1, 1966, proposed the Oakview extension as a solution to the village objections. On August 10, 1966, the Bureau of Public Roads approved the Oakview extension, and on Sep-

tember 12, 1966, the village approved the plans subject to the carrying out of the extension. Final formal approval to the revised plans, including the Oakview extension, was given by the village council on November 7, 1966. It is important to note that construction contracts could not have been let until after this approval was secured. The construction contracts for the main freeway and the interchange ramps were let on November 18, 1966.

There are two condemnation proceedings with which we are here concerned. The original condemnation of lands near the village for Highway No. I-35 was instituted in 1965, and the award of the commissioners was made on December 7, 1965. The second condemnation proceeding, which was necessitated by the Oakview extension and included the property here in question, was instituted in 1968, and the award of the commissioners thereon was made August 5, 1969. We are required to consider appellants' claims that these were separate and unrelated proceedings and that the valuation to be applied in the second case should take into consideration the increased value resulting from the original acquisition.

In discussing the issue as to whether or not the second taking was within the scope of the first, the trial court said:

"* * * As to 22B and C and 22D and E [the second taking] the Court feels that these tracts were originally contemplated, though not specifically designated from the inception of the construction of this Diamond Inter-change. The record is replete with discussions, negotiations, hearings and correspondence requiring that as a result of the closing of 14th Street the Oakhurst [sic] extension be included in the plans."

In support of their contention that the value of their property should be enhanced as a result of the original project to construct Highway No. I-35, appellants rely on those authorities which recognize that, where a distinct tract is condemned in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement made on the land taken and if, at a later date, the condemning authorities should determine to take these other lands, it must pay their market value as enhanced by the factor of proximity. United States v. Miller, 317 U. S. 369, 63 S. Ct. 276, 87 L. ed. 336 (1943); United States v. 172.80 Acres of Land, 350 F. 2d 957 (3 Cir. 1965); United States v. 244.48 Acres of Land, 251 F. Supp. 871 (W. D. Pa. 1966); United States v. 2,353.28 Acres of Land, 414 F. 2d 965 (5 Cir. 1969).

We are of the view, however, that, under the facts before us, those authorities which hold, generally, that enhancement in value caused by a proposed or constructed governmental improvement is not to be

included in determining the fair market value of the land to be taken for the improvement are controlling. Carli v. Stillwater & St. Paul R. Co. 16 Minn. 234 (260) (1871); Union Depot, St. Ry. & Tr. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626 (1883). In Housing & Redevelopment Authority v. Minneapolis Metropolitan Co. 273 Minn. 256, 260, 141 N. W. 2d 130, 135 (1966), we said:

"* * * [A]ny increase or decrease in market value due to the proposed improvement may not be considered in determining market value. Just compensation within the meaning of our constitutional provision as well as the Fifth and Fourteenth Amendments of the Federal Constitution does not include the right to any increment in value resulting from the taking."

In that decision, we relied upon language in Olson v. United States, 292 U. S. 246, 256, 54 S. Ct. 704, 709, 78 L. ed. 1236, 1245 (1934):

"* * * But the value to be ascertained does not include, and the owner is not entitled to compensation for any elements resulting subsequently to or because of the taking."

We followed the authority of the Miller case, where it was held (317 U. S. 376, 63 S. Ct. 281, 87 L. ed. 344):

"If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken * * *."

The Miller case sums up the application of the rule by stating (317 U. S. 377, 63 S. Ct. 281, 87 L. ed. 344):

"The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it."

The Miller case has been followed by other authorities which we consider controlling, including United States v. Crance, 341 F. 2d 161 (8 Cir. 1965), certiorari denied, 382 U. S. 815, 86 S. Ct. 36, 15 L. ed. 2d 63 (1965); Hembree v. United States, 347 F. 2d 109 (8 Cir. 1965); United States v. Birnbach, 400 F. 2d 378 (8 Cir. 1968); United States v. 1,291.83 Acres of Land, 411 F. 2d 1081 (6 Cir. 1969); United States v. First Pyra-

mid Life Ins. Co. of America, 382 F. 2d 804 (8 Cir. 1967); United States v. Reynolds, 397 U. S. 14, 90 S. Ct. 803, 25 L. ed. 2d 12 (1970).

The construction of the interchange caused an interference with travel on village streets. It was necessary for the highway department to undertake to modify its plans to accommodate the improvement to the needs of the village street system. It seems to us that the sequence of events with reference to this problem, which necessarily included exits and entrances as well as the extension of Oakview Avenue, was within the scope of the highway project from the time the highway department was originally committed to it. Although the precise changes and modifications were not in the original plans, it became evident as the plans for the work developed and the problem unfolded that the land in question would be needed for the public use. During the entire period while the plans were being formulated, prior to the formal approval by the village on November 7, 1966, and prior to the time the contracts for the highway and interchange ramps were let, construction of the Oakview extension was considered and plans therefor were submitted and changed from time to time. From the entire fact picture, it appears that the Oakview extension was part of the project as a whole. The record fully supports the conclusion of the trial court that both condemnation proceedings were necessarily within the scope and general purpose of the project, approval of the interchange being contingent upon construction of the extension.

We are accordingly of the view that since the property in question was involved in the construction of the necessary interchange between the two highways, the second condemnation was, under the Miller rule, within the probable scope of the project from the time the state was originally committed to it.

Affirmed.

MR. JUSTICE TODD, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.